UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2015

(Argued:  June 8, 2016    Decided: November 21, 2017*)

Docket No. 15-0690

———————————

Deborah D. Peterson, *et al.*,
Plaintiffs-Appellants,

v.

Islamic Republic of Iran, Bank Markazi, AKA Central Bank of Iran, Banca UBAE, S.p.A., Clearstream Banking, S.A., JPMorgan Chase Bank, N.A., Defendants-Appellees.**

———————————

Before:       POOLER, SACK, and LOHIER, *Circuit Judges*.

The plaintiffs-appellants, judgment creditors of the Islamic Republic of

Iran and Iran's Ministry of Intelligence and Security, seek to enforce their

underlying judgments by obtaining the turnover of $1.68 billion in bond

---

* The decision on this appeal has been delayed for some six months pending the completion of proceedings before the panel with respect to transferring a substantial amount of material in the record that was filed by the parties under seal to the public files of the Court in light of the public's "presumptive right of access to judicial documents."  *Gambale v.  Deutsche Bank AG*, 377 F.3d 133, 140 (2d Cir. 2004); *see also Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982).

** The Clerk of Court is respectfully directed to amend the official caption to conform to the caption as it appears above.  A complete list of plaintiffs in this appeal is attached as an appendix to this opinion.

proceeds allegedly owned by Bank Markazi, Iran's central bank.  The bond

proceeds are allegedly held by Clearstream Banking, S.A., a Luxembourg bank

that maintains accounts on behalf of both Bank Markazi and Banca UBAE, S.p.A.,

an Italian bank that engaged in financial transactions on behalf of Iran.  The bond

proceeds were processed in New York through JPMorgan Chase Bank, N.A.  The

plaintiffs dispute the nature and location of the bond proceeds, arguing that they

are held as United States dollars in New York City and are therefore subject to

the Court's execution jurisdiction.  The plaintiffs also dispute whether several

related non-turnover claims, including several fraudulent-conveyance claims,

brought by the plaintiffs against these banks were released pursuant to

settlement agreements resolving a previous dispute between some of these

parties.  In a single decision, the United States District Court for the Southern

District of New York (Katherine B. Forrest, *Judge*) granted the banks' motions to

dismiss the complaint and for partial summary judgment for the defendants on

all claims in dispute.  We conclude that the settlement agreements released the

plaintiffs' non-turnover claims with respect to some but not all of the banks.  We

also conclude that the assets at issue are in fact located abroad, but that those

assets may nonetheless be subject to turnover under state law pursuant to an

exercise of the court's *in personam* jurisdiction, inasmuch as the district court has the authority under New York State law to direct a non-sovereign in possession of a foreign sovereign's extraterritorial assets to bring those assets to New York State. Those assets will not ultimately be subject to turnover, however, unless the district court concludes on remand that (1) such *in personam* jurisdiction exists and (2) the assets, were they to be recalled, would not be protected from turnover by execution immunity. Accordingly, the district court's judgment is:

AFFIRMED in part, VACATED in part, and REMANDED for further proceedings.

LIVIU VOGEL (James P. Bonner, Patrick L. Rocco, and Susan M. Davies, Stone Bonner & Rocco LLP, *on the brief*), Salon Marrow Dyckman Newman & Broudy LLP, New York, New York, *for Plaintiffs-Appellants.*

DONALD F. LUKE (Bension D. De Funis, *on the brief*), Jaffe & Asher LLP, New York, New York, *for Defendant-Appellee Bank Markazi, AKA Central Bank of Iran.*

UGO COLELLA (John J. Zefutie, Jr., *on the brief*), Thompson Hine LLP, New York, New York, *for Defendant-Appellee Banca UBAE, S.p.A.*

BENJAMIN S. KAMINETZKY (Gerald M. Moody, Jr., *on the brief*), Davis Polk & Wardwell LLP, New York, New York, *for Defendant-Appellee Clearstream Banking, S.A.*

STEVEN B. FEIGENBAUM, Levi Lubarsky Feigenbaum & Weiss LLP, New York, New York, *for Defendant-Appellee JPMorgan Chase Bank, N.A.*

SACK, *Circuit Judge*:

In this litigation, judgment creditors of the Islamic Republic of Iran ("Iran") attempt to execute on $1.68 billion in bond proceeds allegedly owned by Iran's central bank. The Supreme Court has instructed that in an execution proceeding concerning a foreign sovereign's assets, any defense predicated on foreign sovereign immunity must rise or fall on the text of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq. See Republic of Argentina v. NML Capital, Ltd.*, --- U.S. ----, 134 S. Ct. 2250, 2256 (2014). In the same decision, the Court explicitly abrogated decades of pre-existing sovereign immunity common law in light of its background understanding that most courts lack jurisdiction to reach extraterritorial assets in any event. *See id.* at 2257. But that is not so in New York.

The plaintiffs-appellants, judgment creditors of Iran and Iran's Ministry of Intelligence and Security ("MOIS"), obtained federal-court judgments against Iran and MOIS awarding the plaintiffs billions of dollars in compensatory damages. They now seek to enforce their judgments in part by executing on

$1.68 billion in bond proceeds allegedly owned by Bank Markazi ("Markazi"), Iran's central bank. The plaintiffs allege that those bond proceeds were processed by and through a global chain of banks, specifically by Clearstream Banking, S.A. ("Clearstream") through JPMorgan Chase Bank, N.A. ("JPMorgan"), in the name of Banca UBAE, S.p.A. ("UBAE"), on behalf of Markazi (collectively, "the defendants" or "the defendant banks"). The plaintiffs further allege that the bond proceeds are denominated as United States dollars ("USD") and held in cash in Clearstream's account at JPMorgan in New York City, rendering the assets subject to this Court's jurisdiction and a turnover order.[1] The plaintiffs also asserted several related non-turnover claims against the defendant banks, alleging primarily that the defendants effected the foregoing transactions by means of fraudulent conveyances in violation of state law.

The defendant banks respond that there is no cash to turn over: The bond proceeds are in fact recorded as book entries made in Clearstream's Luxembourg offices and reflected as a positive account balance showing a right to payment owed by Clearstream to Markazi through UBAE. The defendants argue that this

---

[1] A turnover order is "[a]n order by which the court commands a judgment debtor to surrender certain property to a judgment creditor, or to the sheriff or constable on the creditor's behalf." *Turnover Order*, BLACK'S LAW DICTIONARY (10th ed. 2014). In this opinion, we use "turnover" and "turnover order" interchangeably.

fact is fatal to the plaintiffs' turnover claims because federal courts lack jurisdiction to order the turnover of a foreign sovereign's extraterritorial assets. Lastly, the defendants posit that the plaintiffs released their non-turnover claims in separate settlement agreements reached between several of the plaintiffs, on the one hand, and Clearstream or UBAE, on the other.

In a single order, the district court (Katherine B. Forrest, *Judge*) granted the defendants' motions to dismiss and for partial summary judgment in favor of the defendants on all claims in dispute. We affirm that decision in part, vacate it in part, and remand for further proceedings.

## BACKGROUND

The plaintiffs-appellants are, or represent persons who have been adjudicated in a federal court to be, victims of Iranian-sponsored terrorism. They obtained judgments from the United States District Court for the District of Columbia against Iran and MOIS pursuant to §§ 1605(a)(7) and 1605A of the FSIA, and were awarded a total of approximately $3.8 billion in compensatory damages. Confidential Appendix ("C.A."[2]) at 679-81. The plaintiffs have since

---

[2] "C.A." refers to the sealed "Confidential Joint Appendix" filed in this Court on June 1, 2015. On November 8, 2017, we ordered the parties to unseal their briefs and the C.A., allowing only redactions we concluded were justified despite the presumptively public

registered their judgments with the United States District Court for the Southern District of New York, which enables them to seek partial enforcement of their judgments by obtaining an order compelling the turnover of approximately $1.68 billion in bond proceeds allegedly owned by Iran's central bank and held as cash in New York City. The plaintiffs' claims target four banks that were allegedly involved in processing those bond proceeds: JPMorgan, a financial institution organized under the laws of New York, *id.* at 679; Markazi, Iran's central bank, *id.* at 677; UBAE, an Italian bank that engaged in transactions on behalf of Iran, *id.* at 678; and Clearstream, a Luxembourg bank with which Markazi and UBAE opened customer accounts, *id.*

The plaintiffs contend that through a series of fraudulent transactions, these banks managed to process billions of dollars in bond proceeds ultimately owed to Markazi. According to the plaintiffs, the fruit of those transactions is a pool of cash traceable to the Markazi-owned bond proceeds and held by Clearstream at JPMorgan in New York City. Because much of this dispute turns on the nature and location of the bond proceeds, we review the processing of

nature of court files. The parties recently completed this process. We have nevertheless maintained the title of the appendix to avoid confusion with a separate "Joint Appendix" in this case that was never filed under seal.

those assets, and previous attempts to obtain turnover of similar assets, in some detail.

### 1. *Processing Markazi's Bonds*

Like many large financial institutions, Markazi invests in foreign sovereign bonds. *Id.* at 701. Many of the bonds purchased by Markazi were issued pursuant to prospectuses that require the purchaser to receive interest and redemption payments in New York State. *Id.* at 555. Markazi has long engaged Clearstream, a Luxembourg bank that specializes in "the settlement and custody of internationally traded bonds and equities," *id.* at 678, to facilitate that process. Clearstream uses correspondent accounts at banks in New York State, including JPMorgan and Citibank, N.A. ("Citibank"), to receive bond proceeds on behalf of its customers, including Markazi. *Id.* at 690. As Clearstream receives these cash payments in New York, it credits customer accounts based in Luxembourg with an equivalent positive amount. *Id.* at 685.

In 1994, Markazi opened a direct account with Clearstream in Luxembourg. *Id.* at 117-18. Thereafter, Clearstream received bond payments into its New York–based JPMorgan correspondent account on behalf of Markazi; Clearstream then credited Markazi's account in Luxembourg with a

corresponding right to payment. In 2008, apparently because of increasing scrutiny of Iranian financial transactions, Markazi stopped processing its bond proceeds through Clearstream directly and instead began doing so through an intermediary bank: UBAE. *Id.* at 699-700. In January 2008, UBAE opened a customer account with Clearstream in Luxembourg—account number 13061. *Id.* at 118-19. Shortly thereafter, Markazi arranged for Clearstream to transfer the Markazi account balance at Clearstream in Luxembourg to the UBAE account. *Id.* at 118, 434.

Clearstream continued to receive bond proceeds in New York on behalf of Markazi, but pursuant to the terms of the documentation directing the Markazi account transfer, Clearstream credited UBAE account number 13061 with a corresponding right to payment. *Id.* at 701. In June 2008, apparently due to increasing attention, Clearstream notified UBAE that it had blocked UBAE account number 13061 and transferred the balance of that account to a "sundry blocked account"—account number 13675. *Id.* at 683-84. That account, which remains blocked, is at the center of the present dispute.

9

### 2. *Peterson I*

Clearstream has previously been the focus of an attempt by judgment creditors of Iran to obtain turnover of Markazi-linked assets. *See generally Peterson v. Islamic Republic of Iran*, No. 10–cv-4518-KBF, 2013 WL 1155576, 2013 U.S. Dist. LEXIS 40470 (S.D.N.Y. Mar. 13, 2013) ("*Peterson I*"), *aff'd*, 758 F.3d 185 (2d Cir. 2014). Many, but not all, of the plaintiffs in the case at bar attempted in an earlier litigation to enforce part of their judgments by executing against approximately $2 billion in Markazi-owned bond proceeds allegedly held by Clearstream at Citibank in New York City. *See* C.A. at 671. Those plaintiffs successfully obtained a judgment from the United States District Court for the Southern District of New York (Katherine B. Forrest, *Judge*) ordering the turnover of $1.75 billion in cash denominated in USD and held in New York City by Clearstream at Citibank on behalf of Markazi and UBAE. *Peterson I*, 2013 WL 1155576, at *2, *35, 2013 U.S. Dist. LEXIS 40470, at *42, *138. The district court's decision in that case did not address the plaintiffs' related fraudulent-conveyance claims concerning an additional $250 million in bond proceeds allegedly transferred by Markazi and UBAE to UBAE's customer account at Clearstream in

Luxembourg. *See id.* at \*3-4, \*28 n.14, 2013 U.S. Dist. LEXIS 40470, at \*46-48, \*117 n.15.

While Markazi unsuccessfully appealed the district court's turnover order in *Peterson I*,[3] Clearstream and UBAE reached separate settlement agreements with the plaintiffs to resolve not only the *Peterson I* appeal but also the plaintiffs' then-pending fraudulent-conveyance claims. C.A. at 900-45 (Clearstream settlement agreement); *id.* at 1646-62 (UBAE settlement agreement).

Of relevance here, the Clearstream settlement agreement released Clearstream from "any and all past, present or future claims or causes of action . . . whether direct or indirect" relating to:

> any account maintained at Clearstream . . . by or in the name of or under the control of any Iranian Entity . . . or any account maintained at Clearstream or at any Clearstream Affiliate by or in the name of or under the control of UBAE, including, but not limited to, accounts numbered . . . 13061 . . . [or] 13675 . . . or any asset or interest held in an Account in the name of an Iranian Entity . . . or . . . any transfer or other action taken by or at the direction of any Clearstream Party, Citibank, or any Iranian Entity, including any transfer or other action in any account, including a

---

[3] In *Peterson I*, the district court concluded that the cash Clearstream held at Citibank was subject to turnover under both the Terrorism Risk Insurance Act of 2002 ("TRIA") and the Iran Threat Reduction and Syria Human Rights Act of 2012. *Peterson I*, 2013 WL 1155576, at \*22-23, 2013 U.S. Dist. LEXIS 40470, at \*97-103. We reached only the latter basis for jurisdiction on appeal and affirmed. *Peterson*, 758 F.3d at 189-92. The Supreme Court granted Markazi's petition for writ of certiorari and also affirmed. *Bank Markazi v. Peterson*, --- U.S. ----, 136 S. Ct. 1310, 1328-29 (2016).

> securities account or cash account or omnibus account or correspondent account maintained in Clearstream's name or under its control, that in any way relates to any Account or any Iranian Asset.

*Id*. at 903.

The Clearstream settlement agreement did, however, reserve the following claims to the *Peterson I* plaintiffs:

> Garnishee Actions. Notwithstanding the [claim release described above], the Covenant shall not bar any action or proceeding regarding (a) the rights and obligations arising under this Agreement, or (b) efforts to recover any asset or property of any kind, including proceeds thereof, that is held by or in the name, or under the control, or for the benefit of, Bank Markazi or Iran . . . in an action against a Clearstream Party solely in its capacity as a garnishee (a "Garnishee Action.") Such a Garnishee Action may include, without limitation, an action in which a Clearstream Party is named solely for the purpose of seeking an order directing that a Clearstream Party perform an act that will have the effect of reversing a transfer between other parties that is found to have been a fraudulent transfer under any legal or equitable theory, provided however that such a Garnishee Action shall not seek an award of damages against a Clearstream Party.

*Id.* at 905 (emphasis omitted).

The UBAE settlement agreement similarly released UBAE and its "beneficiaries" from "any and all liability, claims, causes of action, suits, judgments, costs, expenses, attorneys' fees, or other incidental or consequential damages of any kind, whether known or unknown, arising out of or related to the Plaintiffs' Direct Claims against UBAE," except for those specifically listed in

the agreement. *Id.* at 1648. The agreement defined "Plaintiffs' Direct Claims" as those brought in *Peterson I* "for damages against UBAE with regard to certain assets transferred prior to the initiation of the [t]urnover [a]ction and valued at approximately $250,000,000.00 . . . including, but not limited to, claims for fraudulent conveyance, tortious interference with the collection of a money judgment, and prima facie tort." *Id.* at 1646.

The UBAE settlement agreement also contained a carve-out provision by which the "[p]laintiffs agree[d] that any future claim against UBAE for the Remaining Assets shall be limited to turnover only"; the plaintiffs "waive[d] all other claims against UBAE for any damages regarding the Remaining Assets whether arising in contract, tort, equity, or otherwise." *Id.* at 1648. The agreement defined "Remaining Assets" as "assets [that] remain in an account at Clearstream[] [in] a UBAE customer account, that are beneficially owned by Bank Markazi." *Id.* at 1647.

### 3. *Procedural History*

On December 30, 2013, the plaintiffs filed a complaint in the United States District Court for the Southern District of New York alleging that Clearstream held an additional $2.5 billion in Markazi-owned bond proceeds not at issue in

*Peterson I. See id.* at 3, 28. On April 25, 2014, the plaintiffs filed an amended complaint specifically alleging that UBAE's "blocked sundry account" at Clearstream reflected a balance of approximately $1.68 billion, and that Clearstream held a corresponding amount of cash at JPMorgan in New York City. *Id.* at 687. The amended complaint named Iran, Clearstream, JPMorgan, Markazi, and UBAE as defendants, seeking: (1) declaratory relief identifying Markazi as the beneficial owner of the assets at issue, *id.* at 720-21; (2) rescission of fraudulent conveyances under New York Debtor and Creditor Law ("DCL") §§ 273-a, 276(a), against Iran, Markazi, Clearstream, and UBAE, *id.* at 721-25; (3) turnover of the $1.68 billion in assets at issue under New York Civil Practice Law and Rules ("C.P.L.R.") §§ 5225, 5227 and § 201(a) of the Terrorism Risk Insurance Act ("TRIA"), against Clearstream, Iran, JPMorgan, Markazi, and UBAE, *id.* at 725-27; (4) rescission of fraudulent conveyances under DCL §§ 273-a, 276, 278 and common law, against Clearstream and Markazi, *id.* at 728-29; and (5) unspecified equitable relief against each defendant, *id.* at 729.

On April 9, 2014, the district court (Katherine B. Forrest, *Judge*) granted an ex parte application for an order directing the clerk of the district court to issue a writ of execution with respect to any Markazi-owned property in the possession

14

of JPMorgan. *Id.* at 104-05. The district court thereafter held a hearing to address the defendants' argument that the writ was improper because the Clearstream correspondent account at JPMorgan contains "nothing . . . except cash, and the cash turns over in billions of dollars every day, so there's no possibility the cash in the account can be identified to any defendant," including Markazi. *Id.* at 792. The district court thereupon vacated the order issuing the writ. *Id.* at 793, 800.

The plaintiffs moved to reinstate the order and the defendants responded with various motions seeking dismissal of the amended complaint. Clearstream moved to dismiss on the ground that the assets were located in Luxembourg, and therefore immune from execution under the FSIA. Clearstream also argued that the plaintiffs released all non-turnover claims against Clearstream under their settlement agreement. Markazi moved to dismiss on similar jurisdictional grounds. JPMorgan moved for partial summary judgment on the plaintiffs' turnover claims on the ground that it possessed no assets owned by Markazi. Finally, UBAE moved to dismiss for want of subject-matter jurisdiction, and for partial summary judgment on the plaintiffs' non-turnover claims on the ground that those claims had been released by the UBAE settlement agreement.

The parties' motions were accompanied by a voluminous record.[4]  Among the documents before the district court was a chart depicting a "Recap of Total Debits [and] Credits" in Clearstream's correspondent account at JPMorgan for each month over the four-year period that Clearstream processed the bond proceeds at issue.  *Id.* at 1959.  The chart indicates that the Clearstream account at JPMorgan was both debited and credited many hundreds of billions of dollars each month.  Moreover, the Clearstream correspondent account at JPMorgan frequently posted a negative balance.  *Id.*  JPMorgan submitted, *inter alia*, two declarations prepared by Gauthier Jonckheere, *id.* at 1862-68, 2533-43, a JPMorgan vice president and "relationship manager[]" for the Clearstream account, *id*. at 1862.  Jonckheere stated that Clearstream's correspondent account at JPMorgan is an "operating account" that processes "hundreds of bond-related payments each day."  *Id.* at 1863.  Because this is a general operating account, indeed Clearstream's only account at JPMorgan, "the account's balance at both the beginning and the end of a given business day would . . . be, if not $0, usually very low . . . .  During the day, the account balance would frequently be negative

---

[4] For example, JPMorgan responded to the plaintiffs' request for the production of pertinent documents, *see* C.A. at 1733, by producing more than 100,000 pages of banking records, *see* JPMorgan Br. at 9.

. . . ." *Id.* at 1864. Jonckheere also asserted that "Clearstream's operating account at [JPMorgan] . . . holds no funds that are the property of Markazi" because all bond "proceeds have long since left Clearstream's operating account and are no longer maintained at [JPMorgan]." *Id.* at 1865. Jonckheere added that Clearstream never segregated Markazi's bond proceeds from or within its general operating account. *Id.* at 2537-39.

Clearstream also submitted evidence concerning its JPMorgan correspondent account. For example, it produced a chart documenting its account balance at JPMorgan for each day in October 2012, during which the Clearstream correspondent account balance did not exceed $817,959,813.65, and was frequently negative. *Id.* at 1957. Clearstream also submitted a declaration executed by Mathias Papenfuß, then Head of Operations for Clearstream, *id.* at 1972, who stated: "Each business day Clearstream uses U.S. dollars deposited in the JPMorgan [a]ccount to pay its current U.S. dollar obligations. Each business day, approximately $7-9 billion flows into the JPMorgan [a]ccount, and each business day a roughly equivalent sum flows out." *Id.* at 1973. Papenfuß explained that "[t]he obligations credited to Clearstream by JPMorgan are booked as assets of Clearstream on Clearstream's balance sheet pursuant to

applicable Luxembourg banking law and accounting rules." *Id.* "When Clearstream receives a payment in the JPMorgan [a]ccount on its own security entitlements, Clearstream credits the account of any customers in Luxembourg holding security entitlements against Clearstream relating to a security with the same [identification number]." *Id.* at 1974. Papenfuß corroborated Jonckheere's statement that "[n]o transfer of cash [was] made," adding that "Clearstream does not hold funds in the JPMorgan [a]ccount in relation to specific U.S. dollar obligations to specific customers." *Id.* Papenfuß concluded that "Clearstream never issued instructions to JPMorgan to transfer any funds received in the JPMorgan [a]ccount to the [Clearstream account in Luxembourg], and no such transfers occurred." *Id.* at 1976.

The plaintiffs proffered the opinions of a putative financial-services expert, Peter U. Vinella, *id.* at 2385-440, who asserted that "the customary practice in international banking . . . is for a securities intermediary (such as Clearstream) to segregate its assets from customer assets generally. Thus, the [assets at issue] should [not be] included as part of Clearstream's general operating funds and should remain in the USD JPMorgan [a]ccount," *id.* at 2389. Vinella also stated that "even if Clearstream had failed and continues to fail to properly segregate

the funds at issue in this matter in the [Clearstream account at JPMorgan] . . . , the Markazi USD [b]alance . . . still remains in the USD JPMorgan [a]ccount." *Id.* Vinella attributed evidence that the Clearstream correspondent account often reflected a near-zero or negative end-of-day balance, *see, e.g., id.* at 1957, 1959, 2568-698, to industry-standard "[s]weeps," whereby the account's funds were "invested [by JPMorgan] in very short-dated USD investments and subsequently redeposited in the . . . JPMorgan [a]ccount the next day," *id.* at 2422.

On September 19, 2014, the district court heard arguments on the defendants' motions, focusing in particular on the nature and location of the assets at issue. *See* Joint Appendix ("J.A."[5]) at 83-151. Although the district court appeared to harbor some doubt about the validity of Vinella's expert report, *id.* at 88, it stopped short of holding a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *see* J.A. at 105-06 (considering whether a *Daubert* hearing would be appropriate). Following oral argument, the district court issued an order declining to hold an evidentiary hearing on the nature and location of the assets at issue. *See id.* at 153.

---

[5] "J.A." hereinafter refers to the parties' unsealed joint appendix filed in this Court on June 1, 2015.

On February 20, 2015, the district court issued a single opinion and order granting the defendants' various motions to dismiss and for partial summary judgment on all claims in dispute. *Peterson v. Islamic Republic of Iran*, No. 13-cv-9195-KBF, 2015 WL 731221, 2015 U.S. Dist. LEXIS 20640 (S.D.N.Y. Feb. 20, 2015) ("*Peterson II*") (construing each motion as one "for dismissal"). The district court first dismissed the plaintiffs' non-turnover claims against Clearstream, UBAE, and Markazi on the ground that those claims had been released by the Clearstream and UBAE settlement agreements. *Id.* at *6, 2015 U.S. Dist. LEXIS 20640, at *18-19 (dismissing the non-turnover claims against Clearstream); *id.* at *9, 2015 U.S. Dist. LEXIS 20640, at *28-30 (dismissing the non-turnover claims against UBAE); *id.* at *10, 2015 U.S. Dist. LEXIS 20640, at *30-31 (dismissing the non-turnover claims against Markazi as a "beneficiary" of UBAE under the UBAE settlement).

The district court also dismissed the plaintiffs' turnover claims on jurisdictional grounds, having found that the assets at issue are not in the United States:

> [JPMorgan] received proceeds relating to the [assets], which it credited to
> a Clearstream account at [JPMorgan]. Whether it should have or should
> not have, Clearstream in turn credited amounts attributable to the [assets]

> to the UBAE/Bank Markazi account in Luxembourg. The [JPMorgan] records are clear that whatever happened to the proceeds, they are gone.

*Id.* at \*6, 2015 U.S. Dist. LEXIS 20640, at \*20. That finding sufficed to require dismissal of JPMorgan from the lawsuit because JPMorgan "does not have an account for UBAE or Bank Markazi." *Id.* at \*10 n.17, 2015 U.S. Dist. LEXIS 20640, at \*33 n.17. Turning to the remaining defendants, the district court concluded that Markazi's interest in book entries that Clearstream held in Luxembourg was not subject to turnover because the "FSIA does not allow for attachment of property outside of the United States." *Id.* at \*10, 2015 U.S. Dist. LEXIS 20640, at \*31. Therefore, because Markazi "d[id] not maintain the assets that plaintiffs seek in the United States," the district court held that it "lack[ed] subject-matter jurisdiction." *Id.*

The plaintiffs appealed. With respect to the non-turnover claims, they argue that the Clearstream and UBAE settlement agreements: (1) do not apply to many of the plaintiffs, including several who were not party to *Peterson I*, Pls.' Br. at 23; and, in any event, (2) did not release the non-turnover claims against Clearstream, UBAE, or Markazi, *id.* at 24-33. With respect to the turnover claims, the plaintiffs argue that the court has subject-matter jurisdiction because the assets at issue are (1) cash holdings located in New York, *id.* at 47-51; and (2)

21

therefore subject to turnover under the TRIA, *id.* at 35-36, and the FSIA, *id.* at 61-66. The plaintiffs argue in the alternative that even assets "located abroad" may be subject to turnover pursuant to the court's exercise of *in personam* jurisdiction over the holder of the assets. *Id.* at 55.

**DISCUSSION**

**A. Standard of Review**

With respect to the non-turnover claims, the district court granted Clearstream's motion to dismiss and UBAE's motion for partial summary judgment on the ground that the Clearstream and UBAE settlement agreements released those claims. "We review a district court's interpretation of a contract *de novo.*" *Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 67 (2d Cir. 2002).

As to the turnover claims, "[w]e accord deferential review to a district court ruling on a petition for an order of attachment or execution under the FSIA." *Walters v. Indus. & Commercial Bank of China, Ltd.*, 651 F.3d 280, 285 (2d Cir. 2011). "We review *de novo* legal conclusions denying [or granting] FSIA immunity to a foreign sovereign or its property," and factual findings for "abuse of discretion." *NML Capital, Ltd. v. Republic of Argentina*, 680 F.3d 254, 256-57 (2d Cir. 2012). "A district court is said to have abused its discretion if it has," *inter*

*alia*, "made a clearly erroneous assessment of the evidence." *Id.* at 257 (internal quotation marks omitted).[6]

---

[6] The plaintiffs contend that our review should be particularly meticulous because the district court should have "permitted [p]laintiffs to conduct the relevant discovery or at least held an evidentiary hearing" before ruling on the defendants' motions. Pls.' Br. at 34. We review the district court's "determination not to hold an evidentiary hearing . . . for abuse of discretion." *United States v. Amico*, 486 F.3d 764, 779 (2d Cir. 2007). We do not think that the district court abused its discretion in this case, which was marked by a voluminous record that was reviewed by the court and upon which the parties based their arguments. *See* J.A. at 83-151 (transcript of September 19, 2014 district court proceedings). The plaintiffs principally rely on *Sharkey v. Quarantillo*, 541 F.3d 75 (2d Cir. 2008), in which we cautioned that "[a] district court has discretion to hold a hearing to resolve factual disputes that bear on the court's jurisdiction, but where . . . the case is at the pleading stage and no evidentiary hearings have been held, in reviewing the grant of a motion to dismiss . . . we must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." *Id.* at 83 (internal quotation marks and brackets omitted). *Sharkey* is inapposite because here, unlike in *Sharkey*, the plaintiffs dispute the district court's factual findings made pursuant to deciding, *inter alia*, JPMorgan's motion for partial summary judgment on the plaintiffs' turnover claims on the ground that there are no assets subject to turnover located in the United States. *Peterson II*, 2015 WL 731221, at *10, 2015 U.S. Dist. LEXIS 20640, at *32-33. Moreover, it is within the district court's discretion to decide disputed jurisdictional facts, even at the motion to dismiss stage, without holding an evidentiary hearing where, as here, the court "consider[ed] all the submissions of the parties" and it "has not [been] shown that a hearing was necessary because the resolution of factual issues was not readily ascertainable from the declarations of witnesses or turned on questions of credibility." *Filetech S.A. v. Fr. Telecom S.A.*, 304 F.3d 180, 183 (2d Cir. 2002) (per curiam) (internal quotation marks omitted). Indeed, we have previously stated in the context of an FSIA claim that "[o]n a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and *if necessary*, hold an evidentiary hearing." *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) (emphasis added).

**B. The Non-Turnover Claims**

The district court concluded that the Clearstream settlement agreement and the UBAE settlement agreement released the plaintiffs' non-turnover claims, including the fraudulent-conveyance claims, brought against those banks.[7] *Peterson II*, 2015 WL 731221, at *6, *9, 2015 U.S. Dist. LEXIS 20640, at *18-19, *28-29. The district court also determined that the UBAE settlement agreement released the plaintiffs' non-turnover claims against Markazi because Markazi was a "beneficiary" of UBAE and, therefore, the UBAE settlement agreement. *Id.* at *10, 2015 U.S. Dist. LEXIS 20640, at *30-31. We agree with respect to Clearstream, but not with respect to UBAE or Markazi.

---

[7] The amended complaint contained several fraudulent-conveyance claims: First, the plaintiffs alleged that Iran, Markazi, Clearstream, and UBAE "engaged in a conspiracy to make fraudulent conveyances designed to avoid Iran's debt to [the] [p]laintiffs and other creditors" by transferring the bond proceeds "from Markazi's account at Clearstream to the UBAE/Markazi [a]ccount at Clearstream" in violation of DCL § 276, C.A. at 721, which states that "[e]very conveyance made . . . to hinder, delay, or defraud either present or future creditors" shall be deemed "fraudulent as to both present and future creditors," DCL § 276. Second, the plaintiffs alleged that the same transfer violated DCL § 273-a, C.A. at 724-25, which provides that "[e]very conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if . . . the defendant fails to satisfy the judgment," DCL § 273-a. Finally, the plaintiffs alleged that if the assets at issue are in fact located abroad, they are so located because of transfers that qualify as fraudulent conveyances under the DCL and common law. C.A. at 728-29. Each of the plaintiffs' fraudulent-conveyance claims seeks, *inter alia*, rescission of the allegedly fraudulent transfers. *Id.* at 723, 725, 729.

Before turning to the substance of the settlement agreements, however, we address first the plaintiffs' argument that many of them, including several who were not plaintiffs in *Peterson I*, did not agree to the Clearstream or UBAE settlement agreements and are therefore not bound by their provisions. *See* Pls.' Br. at 23 (arguing with respect to Clearstream); Pls.' Reply at 13-14 (arguing with respect to UBAE). Noting that this argument was not timely raised, the district court dismissed it on the ground that ninety-three percent of the *Peterson I* plaintiffs had agreed to the Clearstream settlement agreement and that figure surpassed "the percentage . . . needed . . . in order for the [Clearstream] settlement [agreement] to become effective" and binding on all of the plaintiffs. *Peterson II*, 2015 WL 731221, at *8, 2015 U.S. Dist. LEXIS 20640, at *27.[8] Moreover, the district court noted that none of the *Peterson I* plaintiffs had declined to sign the agreement. *Id.* We disagree with the district court's analysis insofar as we conclude that the Clearstream settlement agreement is binding only with respect to those plaintiffs who were a party to *Peterson I*.

---

[8] The plaintiffs' post-briefing letter first alerting the district court to this issue concerned only the Clearstream settlement agreement. *See* J.A. at 154. The district court did not, therefore, address the UBAE settlement agreement.

As an initial matter, the district court correctly observed that the plaintiffs belatedly raised this issue. *See id.*, 2015 U.S. Dist. LEXIS 20640, at \*25-26. Only after argument on the parties' motions did plaintiffs' counsel notify the district court by letter that not all of the *Peterson II* plaintiffs were parties to *Peterson I*, or therefore, the resultant Clearstream settlement agreement. J.A. at 154. Moreover, the plaintiffs' letter noted that many of the *Peterson II* plaintiffs who were *Peterson I* plaintiffs had not yet assented to the terms of the Clearstream settlement agreement. *Id.*

"An argument raised for the first time on appeal is typically forfeited." *Katel Ltd. Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 68 (2d Cir. 2010). This rule applies even if a party ultimately presents an issue to the district court in an untimely manner, after briefing and argument on the merits is complete. *See Corsair Special Situations Funds, L.P. v. Nat'l Res.*, 595 F. App'x 40, 43 (2d Cir. 2014) (summary order).

Nonetheless, "[t]he general rule that an appellate court will not consider an issue raised for the first time on appeal is not an absolute bar." *Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploración y Producción*, 832 F.3d 92, 101 n.3 (2d Cir. 2016) (internal quotation marks omitted).

Instead, a forfeited argument "may be reviewed for plain error." *United States v. Gore*, 154 F.3d 34, 41 (2d Cir. 1998). "To establish plain error, the [plaintiffs] must establish (1) error (2) that is plain and (3) affects substantial rights." *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007). Then, "[i]f the error meets these initial requirements, we . . . must consider whether to exercise our discretion to correct it, which is appropriate only if the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id*. (internal quotation marks omitted).

We must first determine whether the plaintiffs in fact forfeited, rather than waived, their argument concerning applicability of the Clearstream settlement agreement. "[F]orfeiture is the failure to make a timely assertion of a right[;] waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). The distinction is meaningful because a waived argument is ordinarily reviewed only "to avoid a manifest injustice," *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008), whereas, as noted, a forfeited argument "may be reviewed for plain error," *Gore*, 154 F.3d at 41.

We think that the plaintiffs forfeited, not waived, their argument. Nothing in the record or briefing suggests that plaintiffs "intentional[ly] relinquish[ed]," as opposed to mistakenly omitted, their argument. *See Olano*, 507 U.S. at 733. Accordingly, we review for plain error.

The district court did not plainly err with respect to those plaintiffs who were parties to *Peterson I*. As noted, the district court found that ninety-three percent of the *Peterson I* plaintiffs had agreed to the terms of the Clearstream settlement agreement, and that no *Peterson I* plaintiff had refused to sign. *Peterson II*, 2015 WL 731221, at *8, 2015 U.S. Dist. LEXIS 20640, at *25-26. The Clearstream settlement agreement plainly states that it "shall [be] effective" upon the agreement of "at least 80%" of the *Peterson I* plaintiffs. C.A. at 904-05. The plaintiffs' sole rebuttal is that the Clearstream settlement agreement "does not bind [non-signatory] [p]laintiffs." Pls.' Reply at 11 (citing C.A. at 902). We find nothing in the part of the record cited by the plaintiffs to support their assertion. Because the plaintiffs have not advanced any other rebuttals, or pointed us to other parts of the record, we cannot say that the district court committed an error "that is plain" with respect to this forfeited argument. *Villafuerte*, 502 F.3d at 209.

The district court did plainly err, however, with respect to those plaintiffs who were not parties to *Peterson I*. The plaintiffs argued, albeit belatedly, that several plaintiffs in this case were not parties to *Peterson I*, or therefore, the resultant Clearstream settlement agreement. J.A. at 154. The part of the district court's decision concerning the applicability of the Clearstream settlement agreement did not address this issue. *See Peterson II*, 2015 WL 731221, at *8, 2015 U.S. Dist. LEXIS 20640, at *25-26 (addressing only non-signatory *Peterson I* plaintiffs). The application of the Clearstream settlement to these non-party plaintiffs was plainly an error affecting those plaintiffs' substantial rights. *See Villafuerte*, 502 F.3d at 209. Moreover, it would "seriously affect[] the fairness" of judicial proceedings, *id*. (internal quotation marks omitted), were we to sanction an order errantly, and without apparent reason, binding several plaintiffs to a settlement agreement that arose from litigation to which they were not party. Accordingly, we vacate that part of the district court's order applying the Clearstream settlement agreement to the *Peterson II* plaintiffs who were not also plaintiffs in *Peterson I*.[9]

---

[9] Likewise, our substantive review of the Clearstream settlement agreement, *see* Part B.1 *infra*, applies only to the plaintiffs here who were also parties to *Peterson I*.

Our plain-error review does not extend, however, to the plaintiffs'
argument, made for the first time in reply, that many of the plaintiffs, including
those who were not party to *Peterson I*, should be similarly excused from the
reach of the UBAE settlement agreement. *See* Pls.' Reply at 13. This argument
was never raised before the district court, even belatedly, *see* J.A. at 154
(addressing only the Clearstream settlement agreement), nor was it directly
raised in the plaintiffs' opening appellate brief, *see* Pls.' Br. at 23 (same). The
preceding analysis aside, "[w]e will not consider an argument raised for the first
time in a reply brief." *United States v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003).

Turning to the substance of the settlement agreements, New York law
governs our review. *See* C.A. at 908 (providing that the Clearstream settlement
agreement shall be governed by New York law); *id.* at 1650-51 (providing that the
UBAE settlement agreement shall be governed by New York law). Settlement
agreements are "contract[s] and [their] meaning must be discerned under several
cardinal principles of contractual interpretation." *Brad H. v. City of New York*, 17
N.Y.3d 180, 185, 951 N.E.2d 743, 746 (2011). "Where [a] contract is unambiguous,
courts must effectuate its plain language." *Seabury*, 289 F.3d at 68 (citing *Slamow
v. Del Col*, 79 N.Y.2d 1016, 594 N.E.2d 918, 919 (1992)). "To determine whether a

writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole." *Brad H.*, 17 N.Y.3d at 185, 951 N.E.2d at 746. We consider the Clearstream and UBAE settlement agreements in light of those principles.

### 1. *The Clearstream Settlement Agreement*

The Clearstream settlement agreement released "all past, present or future claims or causes of action . . . arising out of, or relating in any way to" Clearstream "accounts numbered . . . 13061 [the UBAE customer account] . . . [or] 13675 [the sundry blocked account]." C.A. at 903. The settlement agreement excepted from that release "[g]arnishee [a]ctions" against Clearstream "regarding . . . efforts to recover any asset or property of any kind . . . that is held by or in the name, or under the control, or for the benefit of, Bank Markazi or Iran . . . in an action against . . . Clearstream . . . solely in its capacity as a garnishee." *Id.* at 905 (emphasis omitted). The district court properly concluded that these provisions released the plaintiffs' non-turnover claims against Clearstream.

Under New York law, a "garnishee" action is one for the "turnover" of "assets already within [the garnishee's] possession." *Commonwealth of the Northern Mariana Islands v. Canadian Imperial Bank of Commerce*, 21 N.Y.3d 55, 64,

31

990 N.E.2d 114, 120 (2013). The plaintiffs' non-turnover claims, by contrast,
involve more than obtaining the turnover of assets already within Clearstream's
possession. For example, the plaintiffs' fraudulent-conveyance claims brought
under DCL § 276 entail a showing of, *inter alia*, fraudulent intent. *See Wall St.
Assocs. v. Brodsky*, 257 A.D.2d 526, 528-29, 684 N.Y.S.2d 244, 247-48 (1st Dep't
1999). The non-turnover claims brought against Clearstream therefore fall within
the settlement agreement's broad release of "all" claims arising out of or relating
to the Clearstream accounts at issue. C.A. at 903. The plaintiffs' argument that
the release should be construed in their favor, Pls.' Br. at 22-23, 28, yields to an
"explicit, unequivocal statement of a present promise to release [a party] from
liability." *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 515 (2d Cir. 2001) (internal
quotation marks omitted); *see also Vt. Teddy Bear Co. v. 538 Madison Realty Co.*,
1 N.Y.3d 470, 475, 807 N.E.2d 876, 879 (2004).

The plaintiffs contend that the Clearstream settlement agreement released
only claims relating to those "litigated in *Peterson I*" and "damages claims against
Clearstream." Pls.' Br. at 29 (emphasis omitted). The plain language of the
release provision suggests otherwise. The settlement agreement purported to
release all claims "concerning" several "Covered Subjects," C.A. at 903 (emphasis

omitted), a defined term that includes "any claims alleged against Clearstream by judgment creditors . . . in *Peterson* [*I*]; *or* [] any account maintained at Clearstream . . . including . . . accounts numbered . . . 13061 [the UBAE customer account] . . . [or] 13675 [the sundry blocked account]," *id.* (emphasis added).  The plaintiffs' argument rests on the (we think mistaken) suggestion that the release of "all" claims applies only to "Peterson Direct Claims," a defined term that is distinct from "Direct Claims," also a defined term.  Contrary to the plaintiffs' suggestion, only the former term is restricted to "asserted claims in *Peterson* [*I*]."  *Id.* at 901.  By contrast, the term "Direct Claims," the subject of the release provision, is defined more broadly as "all" claims "concerning" the "Covered Subjects."  *Id.* at 903 (emphasis omitted).

The plaintiffs argue that their fraudulent-conveyance claims against Clearstream nonetheless qualify as "garnishee actions" under the settlement agreement's carve-out provision.  The plaintiffs note that "judgment creditors can obtain turnover from garnishees by undoing fraudulent conveyances."  Pls.' Br. at 30.  Be that as it may, the relief that one can obtain from a fraudulent-conveyance action does not convert that claim into a "garnishee action," which, as previously noted, is a cause of action that seeks the turnover of assets already in the

33

garnishee's possession. *See* N.Y. C.P.L.R. § 105(i) ("A 'garnishee' is a person . . . other than the judgment debtor who has property *in his possession or custody* in which a judgment debtor has an interest." (emphasis added)). Moreover, the Clearstream settlement agreement limits permissible "garnishee actions" to those in which Clearstream is named "solely in its capacity as a garnishee." C.A. at 905 (emphasis omitted).

The plaintiffs argue that this final provision encompasses their fraudulent-conveyance claims because it permits "an action in which . . . Clearstream . . . is named solely for the purpose of seeking an order directing that . . . Clearstream . . . perform an act that will have the effect of reversing a transfer between other parties that is found to have been a fraudulent transfer." *Id*. We disagree. The plaintiffs' fraudulent-conveyance claims against Clearstream allege more than a transfer "between other parties," including, for example, the allegation that Clearstream was an active "[c]onspirator[]" in the alleged fraudulent scheme.[10] *Id.* at 707, 721. We therefore affirm that part of the district court's order granting

---

[10] The carve-out provision indicates that a permissible "[g]arnishee [a]ction" includes, *inter alia*, an order to reverse a transfer between other parties "that is *found* to have been a fraudulent transfer." C.A. at 905 (emphasis added). No such finding has been made with respect to the assets at issue.

Clearstream's motion to dismiss the plaintiffs' non-turnover claims brought against Clearstream.

### 2. *The UBAE Settlement Agreement*

We vacate, however, the district court's order granting UBAE's motion for partial summary judgment with respect to the plaintiffs' non-turnover claims brought against UBAE.

The UBAE settlement agreement "release[d] UBAE and all of its past, present and future . . . beneficiaries . . . from any and all liability, claims, causes of action, suits, judgments, costs, . . . or other incidental or consequential damages of any kind . . . arising out of or related to the [p]laintiffs' Direct Claims against UBAE." *Id.* at 1648. "Direct Claims" as defined in the UBAE settlement agreement includes "claims in *Peterson* [*I*] for damages against UBAE with regard to certain assets transferred . . . and valued at approximately $250,000,000.00 . . . , including, but not limited to, claims for fraudulent conveyance, tortious interference with the collection of a money judgment, and prima facie tort." *Id.* at 1646. The same provision refers to these *Peterson I* "Direct Claims" collectively as "the Turnover Action." *Id.* The UBAE settlement agreement also provides that the "[p]laintiffs agree that any future claim against UBAE for the Remaining

Assets shall be limited to turnover only, and [the p]laintiffs waive all other claims against UBAE for any damages regarding the Remaining Assets." *Id.* at 1648. "Remaining Assets" are defined by the UBAE settlement agreement as "certain assets [that] remain in an account at Clearstream[] [in] a UBAE customer account[] that are beneficially owned by Bank Markazi." *Id.* at 1647.

As indicated in a summary order published in tandem with this decision,[11] we disagree with the district court's conclusion that these provisions necessarily released the plaintiffs' non-turnover claims, including their fraudulent-conveyance claims, brought against UBAE. The UBAE settlement agreement provides that "any future claim against UBAE" for the assets at issue "shall be limited to turnover only." *Id.* at 1648. The term "turnover" is not defined. But the agreement, taken "as a whole," *Brad H.*, 17 N.Y.3d at 185, 951 N.E.2d at 746, suggests that the parties intended the term to encompass the plaintiffs' fraudulent conveyance claims insofar as the agreement refers to the *Peterson I* claims, which included both fraudulent-conveyance and turnover-qua-turnover claims, as "the Turnover Action," C.A. at 1646.

---

[11] *See generally Olson v. Banca UBAE, S.p.A.*, Nos. 15-2213, 15-2535.

UBAE argues that under New York law, a claim seeking "turnover" is an action brought under C.P.L.R. Article 52, which provides "a procedural mechanism . . . rather than a . . . substantive right." *Mitchell v. Garrison Protective Servs., Inc.*, 819 F.3d 636, 640 (2d Cir. 2016) (emphases omitted). Although UBAE may be correct about the meaning of "turnover" as used in New York law, we do not think that this resolves what we conclude to be the ambiguity of that term as used by the parties in the UBAE settlement agreement. The question for us on appeal is not whether a turnover proceeding and fraudulent-conveyance claim are one and the same under New York law. It is, instead, what the parties meant by use of the word "turnover" as employed in the UBAE settlement agreement. We conclude that when the UBAE settlement agreement is viewed in its entirety, the meaning of the term is ambiguous.

We also note that, under New York law, a party may allege a fraudulent-conveyance claim within a turnover action brought under C.P.L.R. Article 52. *See Gelbard v. Esses*, 96 A.D.2d 573, 575, 465 N.Y.S.2d 264, 267 (N.Y. App. Div. 2d Dep't 1983) ("CPLR [§] 5225 may serve as the means to set aside a transfer made by a judgment debtor to defraud his creditors." (citation omitted)); *see also Mitchell v. Lyons Prof'l Servs., Inc.*, 109 F. Supp. 3d 555, 563 (E.D.N.Y. 2015) ("What

C.P.L.R. §§ 5225 and 5227 provide, in contrast to a plenary action, is a procedural mechanism for attacking a fraudulent conveyance . . . , colloquially known as 'turnover proceedings.'"), *aff'd sub nom. Mitchell v. Garrison Protective Servs., Inc.*, 819 F.3d at 640 (describing C.P.L.R. § 5225 as a "mechanism for avoiding a fraudulent transfer in New York").[12]  While UBAE correctly observes that "fraudulent conveyance is not a *necessary* element of a turnover action," UBAE Br. at 26 (emphasis added), it incorrectly surmises from that observation that fraudulent conveyance therefore cannot be an element of a turnover action.  But, as we have noted, whether UBAE is correct about New York law does not resolve whether it is also correct about the meaning of the UBAE settlement agreement.

---

[12] As noted, whether the plaintiffs' fraudulent-conveyance claims are "turnover" claims as that term is used in the UBAE settlement agreement is ambiguous.  The distinction between fraudulent-conveyance and turnover claims under New York law is also ambiguous.  Although a turnover action may be based on and contain a fraudulent-conveyance allegation, a fraudulent-conveyance claim may also be pursued as a plenary action to avoid a transfer.  *See Bienstock v. Greycroft Partners, L.P.*, 128 A.D.3d 459, 459, 7 N.Y.S.3d 893, 893 (N.Y. App. Div. 1st Dep't 2015) ("The motion court erred in awarding attorneys' fees since this is a turnover proceeding brought pursuant to [N.Y. C.P.L.R.] 5225(b) as opposed to an action or proceeding to set aside a fraudulent conveyance (*compare* [DCL] § 276-a).").  Thus, while we are sympathetic to UBAE's interpretation of "turnover," the meaning of that term is ambiguous both as used in the UBAE Settlement Agreement and under state law.

UBAE might benefit from the plaintiffs' agreement to "release UBAE . . . from . . . causes of action . . . related to the . . . Direct Claims against UBAE." C.A. at 1648. In context, however, the meaning of "related to" is also ambiguous. It is certainly the case that both the *Peterson I* claims—i.e., the "Direct Claims"—and those at issue here concern related transactions, specifically, the allegedly fraudulent transfers of bond proceeds linked to Markazi. On the other hand, the plaintiffs in this litigation seek to recover proceeds related to a distinct set of bonds. Accordingly, it is not apparent to us that their fraudulent-conveyance claims here are necessarily "related to" the *Peterson I* Direct Claims.

Thus, although it is clear that the UBAE settlement agreement released UBAE from "any and all . . . claims [or] causes of action," C.A. 1648, "for damages against UBAE with regard to [the assets at issue in *Peterson I*]," *id.* at 1646, the settlement's applicability beyond such claims is unclear. Because the question on a motion for summary judgment is "whether the contract is unambiguous with respect to the question disputed by the parties," *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002), and "[a]n ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined

39

the context of the entire . . . agreement," *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted), the district court erred by granting UBAE's motion for partial summary judgment with respect to the plaintiffs' non-turnover claims.

UBAE argues that "[t]he definition of 'Plaintiffs' Direct Claims' in the [UBAE settlement agreement] specifically includes the *Peterson II* fraudulent conveyance claims." UBAE Br. at 21. We disagree. The UBAE Settlement Agreement defines "Direct Claims" as those "in *Peterson* [*I*] for damages against UBAE with regard to certain assets [at issue in *Peterson I*] . . . and valued at approximately $250,000,000.00 (the 'Transferred Assets'), including, but not limited to, claims for fraudulent conveyance." C.A. at 1646. Although this provision clearly includes the *Peterson I* fraudulent-conveyance claims among the *Peterson I* "Direct Claims," it also plainly requires that those causes of action concern the assets at issue in *Peterson I*. The fraudulent-conveyance claims brought against UBAE in this litigation of course do not satisfy that requirement.

For the foregoing reasons, we vacate the district court's conclusion that the UBAE settlement agreement released the plaintiffs' non-turnover claims brought

against UBAE and remand the case to the district court for further proceedings with respect to those claims.[13]

### 3. *Application of the UBAE Settlement Agreement to Claims Brought Against Markazi*

The district court also determined that the UBAE settlement agreement also released the plaintiffs' non-turnover claims against Markazi. *Peterson II*, 2015 WL 731221, at *10, 2015 U.S. Dist. LEXIS 20640, at *30-32. We disagree. The UBAE settlement agreement released certain claims brought against UBAE and undefined UBAE "beneficiaries." C.A. at 1648. It made clear, however, that this release "does not impact the ability of any of the [p]arties to pursue claims against Clearstream, Citibank, Bank Markazi, [or] Iran." *Id.* at 1649. Whoever

---

[13] The UBAE and Clearstream settlement agreements are distinguishable inasmuch as the latter is unambiguous with respect to its release of certain claims. While the UBAE settlement agreement nebulously limits the plaintiffs to undefined "turnover" claims, C.A. at 1648, the Clearstream settlement agreement limits the plaintiffs to defined "[g]arnishee [a]ctions" against "Clearstream . . . solely in its capacity as a garnishee," *id.* at 905 (emphasis omitted). Unlike the term "turnover" as used in the UBAE settlement agreement, the term "[g]arnishee [a]ctions" is defined by the Clearstream settlement agreement and includes such actions only where "Clearstream . . . is named solely for the purpose of seeking an order directing that . . . Clearstream . . . perform an act that will have the effect of reversing a transfer between other parties that is found to have been a fraudulent transfer." *Id.* The plaintiffs' fraudulent-conveyance claims against Clearstream sought to accomplish more than permitted by the pertinent settlement agreement; the same cannot be said for the fraudulent-conveyance claims brought against UBAE.

and whatever the parties meant to define as UBAE "beneficiaries," it seems clear that Markazi was not included.

The district court therefore erred by dismissing the plaintiffs' non-turnover claims, including the fraudulent-conveyance claims, brought against Markazi. Accordingly, we vacate that part of the district court's order and remand the case to the district court for further proceedings with respect to the plaintiffs' non-turnover claims brought against Markazi.

**C. The Turnover Claims**

The plaintiffs seek to enforce their underlying judgments against Iran and MOIS by executing on $1.68 billion of Markazi-owned bond proceeds. The plaintiffs' claims seeking a turnover order to that effect rest, as an initial matter, on the nature and location of the bond proceeds. The plaintiffs contend that they are denominated as USD and held as cash in New York City at Clearstream's correspondent account at JPMorgan. The defendants argue that there is no cash; at most, Markazi owns, through UBAE, a right to payment from Clearstream in the amount of $1.68 billion as reflected on book entries located in Luxembourg. Whether the plaintiffs can obtain an order compelling one or several of the defendants to turn over the assets at issue depends first on the nature and

location of the assets, and second on the court's jurisdiction for execution of those assets, whatever and wherever they are.

### 1. *The Nature and Location of the Assets*

The plaintiffs insist that Clearstream holds the bond proceeds in New York City as cash in its correspondent account at JPMorgan. The district court disagreed, finding sufficient record evidence that the bond proceeds are not held as cash in New York City but are recorded as a right to payment in Luxembourg. *Peterson II*, 2015 WL 731221, at *6, 2015 U.S. Dist. LEXIS 20640, at *20 ("[JPMorgan] received proceeds relating to the [bonds], which it credited to a Clearstream account at [JPMorgan]. Whether it should have or should not have, Clearstream in turn credited amounts attributable to the [bonds] to the UBAE/Bank Markazi account in Luxembourg. The [JPMorgan] records are clear that whatever happened to the proceeds, they are gone."). We agree.

It is undisputed that Clearstream's correspondent account at JPMorgan was a general "operating account," C.A. at 1863, used to service transactions on behalf of many customers who are not parties to this litigation, *id*. at 1973-74, 2541; *see also id*. at 2834-35. Although Clearstream received bond proceeds into this general account, *id*. at 685, the account's USD holdings were not segregated

by customer, *id.* at 2537-39. Moreover, no cash attributable to the Markazi-owned bond proceeds was transferred from Clearstream's correspondent account at JPMorgan to Markazi or UBAE. *Id.* at 1976. Clearstream instead used its general pool of cash to meet other obligations. *Id.* at 1865-66. As a result, approximately seven to nine billion dollars flowed in and out of the Clearstream correspondent account each day. *Id.* at 1973. Indeed, JPMorgan records show that this account frequently had a near-zero or negative end-of-day balance.[14] *Id.* at 1864, 1959.

The plaintiffs' putative expert, Peter U. Vinella, attributed minuscule or negative end-of-day balances to industry-standard "[s]weeps." C.A. at 2422. Under this theory, JPMorgan commandeered the Clearstream correspondent account at the close of business, "invested [its funds] in very short-dated USD investments[,] and subsequently redeposited . . . the USD [in the] JPMorgan [a]ccount the next day . . . , essentially refilling the bucket." *Id*. (internal

---

[14] A footnote in the plaintiffs' brief challenges Jonckheere's declarations as hearsay. *See* Pls.' Br. at 49 n.4. Even ignoring the significant record evidence that is independent and corroborative of Jonckheere's statements, the plaintiffs' challenge is meritless. "[W]e afford district courts wide latitude in determining whether evidence is admissible," and "review . . . evidentiary rulings for abuse of discretion, reversing only if we find manifest error." *United States v. Miller*, 626 F.3d 682, 687-88 (2d Cir. 2010) (internal quotation marks and ellipsis omitted). The district court did not abuse its discretion by considering declarations executed by Jonckheere, the JPMorgan account manager who conducted a "regular[] review" of Clearstream's correspondent account. C.A. at 2535.

quotation marks omitted). Vinella opined that these sweeps "are not generally reflected on the customer's statement" so that "the funds remain in the bank account from the customer's perspective." *Id.* JPMorgan acknowledged that it indeed "employ[ed] an investment sweep mechanism during the 2008-2012 period that enabled it to pay overnight interest to Clearstream." *Id.* at 2541.

We nonetheless agree with the district court that "Vinella's argument that the money is somehow still there [does not] really work[]." J.A. at 88 (raising this concern during the September 19, 2014 argument). Even assuming that JPMorgan's sweeps used all cash holdings in the Clearstream correspondent account, JPMorgan established through bank records that "the end-of-day balances in the account that were available for overnight investment were never more than a small fraction of the $1.68 billion that make up the [assets at issue]." C.A. at 2541. In fact, the Clearstream correspondent account rarely had an end-of-day balance greater than $300 million, far short of the $1.68 billion sought by the plaintiffs. *See* J.A. at 80. JPMorgan may have swept all cash in the Clearstream correspondent account, but the plaintiffs have offered no evidence that those sweeps were performed specifically with *Markazi's* cash.

Moreover, Jonckheere, the JPMorgan account manager for Clearstream, offered an undisputed explanation for Clearstream's near-zero end-of-day account balances: "[JPMorgan] and Clearstream have an arrangement under which [JPMorgan] will at its discretion advance a very significant amount of intra-day liquidity to Clearstream to allow Clearstream's [correspondent account] to be overdrawn and thereby ensure that the account operates smoothly at all times." C.A. at 2539. This explanation and Vinella's sweep theory are not mutually exclusive. And both are consistent with the district court's finding that $1.68 billion in cash attributable to Markazi's bond proceeds is not sitting in Clearstream's correspondent account at JPMorgan in New York City.

Vinella separately posited that "Clearstream cannot hold or process USD in Luxembourg in any material amount." *Id.* at 2408. Maybe so. But it does not follow that Clearstream must be holding $1.68 billion in cash in New York City. Vinella's observation is entirely consistent with the undisputed record evidence that Clearstream received cash payments into a general pool, which was drawn down on a daily basis to service many customers' demands. Clearstream then caused a corresponding credit to be reflected in the Markazi, and later UBAE,

46

account in Luxembourg as a right to payment equivalent to the bond proceeds that Clearstream received and processed in New York.

The location of that right to payment is determined by state law.  *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 83 (2d Cir. 2002); *see also EM Ltd. v. Republic of Argentina*, 389 F. App'x 38, 44 (2d Cir. 2010) (summary order) (relying on state law to determine the location of property).  Under New York law, the situs of an intangible property interest, such as the right to payment relevant here, is "the location of the party of whom performance is required by the terms of the contract."  *ABKCO Indus., Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, 675, 350 N.E.2d 899, 902 (1976) (noting that where an intangible property interest is represented by a negotiable instrument, the physical location of that instrument determines the location of the property interest); *see also Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303, 315, 926 N.E.2d 1202, 1210 (2010) ("[W]here a creditor seeks to attach a debt (an intangible form of property) solely for security purposes (i.e., the debtor is subject to the court's personal jurisdiction), the situs of the debt is wherever the debtor is present.").  In this case, the right to payment is reflected as a book entry or account balance

47

maintained in Luxembourg by Clearstream, a Luxembourg entity. Thus, the asset the plaintiffs seek—a right to payment—is located in Luxembourg.

The plaintiffs advance several rebuttals, each presuming the validity of their position that Clearstream holds a segregated pool of $1.68 billion in cash traceable to the bond proceeds in New York. For example, the plaintiffs argue that "the empty act of making book entries to a Luxembourg account without an accompanying transfer did not alter the location of the Markazi-owned assets." Pls.' Br. at 49. That is neither controversial nor surprising: There was no accompanying transfer of cash to Markazi or UBAE. For similar reasons, the plaintiffs' contention that fraudulent conveyances have no legal effect is of no moment. This argument presumes "that [the] [d]efendants moved the [b]ond [p]roceeds to Luxembourg." *Id.* at 51. Not so. No bond proceeds were "moved," at least not as envisaged by the plaintiffs. Rather, cash flowed into the Clearstream correspondent account at JPMorgan, which was then used to meet other customers' demands. Markazi was made whole by its interest in the recordation of an equivalent right to payment in Luxembourg.

The plaintiffs argue that under the Uniform Commercial Code ("UCC"), Clearstream "must maintain a corresponding financial asset (*i.e.*, USD) sufficient

to satisfy . . . entitlements [owed to Markazi and UBAE]," and "those USD[] must be segregated from Clearstream's assets." *Id.* at 49. We need not, and therefore do not, comment on the propriety of Clearstream's banking practices under the UCC, assuming that it applies.[15] Even if the bond proceeds should have been segregated and held as cash, they were not; there is not, therefore, property in New York subject to turnover. Contrary to the plaintiffs' suggestion, *see* Pls.' Br. at 40, this position is not inconsistent with *Peterson I*, in which the district court concluded that a separate set of bond proceeds—held at a different bank that is not party to this litigation—were both located in New York and owned by Markazi for reasons wholly unrelated to the UCC. *Peterson I*, 2013 WL 1155576, at *30-31, 2013 U.S. Dist. LEXIS 40470, at *121-24. In any event, the question whether the UCC governs Markazi's ownership interest in and rights to the bond proceeds is unrelated to the nature and location of those assets.

The nature and location of the asset here—a right to payment located in Luxembourg—distinguishes this case from *Peterson I*, where it was "undisputed" that Clearstream held a segregated pool of "$1.75 billion in cash proceeds of the bonds . . . in an account at Citigroup in New York." *Id*. at *2, 2013 U.S. Dist.

---

[15] Clearstream asserts that it does not. *See* Clearstream Br. at 34-37.

LEXIS 40470, at *42.  Indeed, in *Peterson I* the district court specifically found that "nearly $2 billion in bond proceeds [traceable to Markazi] is sitting in an account in New York at Citibank," which the court determined was far from a "fleeting or ephemeral interest[]."  *Id.* at *24, 2013 U.S. Dist. LEXIS 40470, at *103.  Here, by contrast, there never was a traceable or segregated pool of Markazi-owned bond proceeds held as cash in Clearstream's correspondent account at JPMorgan in New York City.

We conclude that the assets at issue are, therefore, represented by a right to payment in the possession of Clearstream located in Luxembourg. Accordingly, the district court properly granted JPMorgan's motion for partial summary judgment because JPMorgan is not in possession of any assets subject to turnover.  Similarly, neither Markazi nor UBAE possesses any assets subject to turnover here because the asset at issue is in fact held by Clearstream and represented as a positive account balance in a "sundry blocked account" to which neither Markazi nor UBAE has access.  C.A. at 684.  We therefore turn to whether the principal asset at issue, a right to payment held by Clearstream and located in Luxembourg, is subject to execution.

## 2. *Jurisdiction for Execution*

The district court concluded that it lacked jurisdiction to order turnover because the principal asset at issue—a right to payment recorded and held in Luxembourg—is located outside the United States and, therefore, absolutely immune from execution under the FSIA. *Peterson II*, 2015 WL 731221, at *10, 2015 U.S. Dist. LEXIS 20640, at *31-32. Although the district court's assumption was reasonable in light of many judicial decisions suggesting as much, we think it was incorrect.

Before the FSIA, foreign sovereigns were generally afforded broad immunity from the jurisdictional reach of American courts. *NML Capital*, 134 S. Ct. at 2255. Foreign sovereign immunity was offered as "a matter of grace and comity . . . not a restriction imposed by the Constitution." *Id.* (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983)). Pursuant to this discretionary practice, "the United States gave absolute immunity to foreign sovereigns from," in particular, "the execution of judgments."[16] *Autotech Techs. v.*

---

[16] As Justice Scalia explained for the Court in *NML Capital*, this was long at the behest of the executive branch, "which typically requested immunity in all suits against friendly foreign states." *NML Capital*, 134 S. Ct. at 2255. That changed in 1952, when "the State Department embraced (in the so-called Tate Letter) the restrictive theory of sovereign immunity, which holds that immunity shields only a foreign sovereign's

*Integral Research & Dev. Corp.*, 499 F.3d 737, 749 (7th Cir. 2007). "This rule required plaintiffs who successfully obtained a judgment against a foreign sovereign to rely on voluntary repayment by that State." *Id.*

The prevailing regime changed in 1976 with the enactment of the FSIA, a "comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state." *Verlinden*, 461 U.S. at 488. Since its enactment, courts have held that "the FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989); *see also Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 47 (2d Cir. 2010) ("The [FSIA] provides the exclusive basis for subject matter jurisdiction over all civil actions against foreign state defendants, and therefore for a court to exercise subject matter jurisdiction over a defendant the action must fall within one of the FSIA's exceptions to foreign sovereign immunity." (citation omitted)).

---

public, noncommercial acts." *Id.* (internal quotation marks omitted). It has been observed that this shift "thr[ew] immunity determinations into some disarray" because "political considerations sometimes led the [State] Department to file suggestions of immunity in cases where immunity would not have been available under the restrictive theory." *Republic of Austria v. Altmann*, 541 U.S. 677, 690 (2004) (internal quotation marks omitted). "Congress abated the bedlam in 1976" with the FSIA. *NML Capital*, 134 S. Ct. at 2255.

Section 1604 of the FSIA provides in general terms for foreign sovereign immunity: "[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States." 28 U.S.C. § 1604. The law then subjects this limit on *in personam* jurisdiction to several exceptions. *See id.* §§ 1605-07. In this case, for example, the plaintiffs obtained their judgments against Iran and MOIS pursuant to § 1605A, C.A. at 1673-75,[17] which vitiates immunity "in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, . . . or the provision of material support or resources for such an act," 28 U.S.C. § 1605A(a)(1).

In addition to jurisdictional immunity, the FSIA also provides foreign sovereigns so-called "execution immunity": Section 1609 states that, generally, "the property in the United States of a foreign state shall be immune from

---

[17] The plaintiffs also obtained their underlying judgments pursuant to § 1605(a)(7), a since-repealed provision of the FSIA that similarly suspended jurisdictional immunity where "money damages [were] sought against a foreign state for personal injury or death that was caused by an act of torture [or] extrajudicial killing." 28 U.S.C. § 1605(a)(7) (2006); *see also Weinstein*, 609 F.3d at 48 n.4 ("In 2008, Congress repealed § 1605(a)(7) and created a new section [§ 1605A] specifically devoted to the terrorism exception to the jurisdictional immunity of a foreign state." (citing Pub. L. No. 110-181, § 1083, 122 Stat. 3, 341 (2008))). As relevant here, § 1605(a)(7) provided the same exception to jurisdictional immunity as does § 1605A.

attachment arrest and execution." *Id.* § 1609. Execution immunity is also subject to several exceptions, *id.* §§ 1610-11, three of which the plaintiffs argue permit execution here: first, § 1610(a), which permits execution against "property in the United States of a foreign state . . . used for a commercial activity in the United States . . . if . . . the judgment relates to a claim for which the foreign state is not immune under [§ 1605A]," *id.* § 1610(a)(7); second, § 1610(g), which authorizes execution against "the property of a foreign state against which a judgment is entered under [§ 1605A] . . . upon that judgment as provided in this section," *id.* § 1610(g)(1); and third, TRIA § 201(a), codified as a note to FSIA § 1610, which reads:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C. § 1605A], the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA, Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337-40 (2002) (codified at 28 U.S.C. § 1610 note); *see also Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 131 (2d Cir. 2016) ("The TRIA provides jurisdiction for execution and

attachment proceedings to satisfy a judgment for which there was original jurisdiction under the FSIA if certain statutory elements are satisfied.").

The FSIA framework of immunities and exceptions is "comprehensive," *NML Capital*, 134 S. Ct. at 2255-56; *see also Republic of Austria v. Altmann*, 541 U.S. 677, 699 (2004); *Verlinden*, 461 U.S. at 493, and, therefore, supersedes the "pre-existing common law" of foreign sovereign immunity, *Samantar v. Yousuf*, 560 U.S. 305, 313 (2010).  As the Supreme Court wrote in *NML Capital*, "any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text.  Or it must fall."  134 S. Ct. at 2256.

Comprehensive though it may be with respect to immunities and exceptions, the FSIA does not specify "the circumstances and manner of attachment and execution proceedings."  *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 474 n.10 (2d Cir. 2007); *see also Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1130 (9th Cir. 2010) ("The FSIA does not provide methods for the enforcement of judgments against foreign states, only that those judgments may not be enforced by resort to immune property.").[18]  Accordingly, "[i]n attachment

---

[18] FSIA § 1610(c) does, however, enumerate broad limitations on "attachment or execution," viz., "[n]o attachment or execution . . . shall be permitted until the court has

actions involving foreign states, federal courts . . . apply Fed. R. Civ. P. 69(a)."

*Karaha Bodas Co.*, 313 F.3d at 83. Under that Rule, "a district court has the authority to enforce a judgment by attaching property in accordance with the law of the state in which the district court sits." *Koehler v. Bank of Berm. Ltd.*, 544 F.3d 78, 85 (2d Cir. 2008).

   In New York, that law is C.P.L.R. § 5225,[19] which provides in pertinent part:

---

ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of [the FSIA]." 28 U.S.C. § 1610(c).

   [19] The plaintiffs brought their state-law turnover claims under C.P.L.R. §§ 5225, 5227. The former concerns the turnover of "property," including "money or other personal property," N.Y. C.P.L.R. § 5225; the latter concerns the turnover of "debts owed to the judgment debtor," *id.* § 5227. Our analysis turns on § 5225. "Although New York law draws a line between a debt owed to a judgment debtor and property owned by the judgment debtor but in the possession of another, that line can at times become too fine to distinguish." *Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 190 F.3d 16, 21 (2d Cir. 1990) (internal quotation marks and alteration omitted). We think that Iran's right to payment, held by Clearstream, falls on the "property" side of that blurred line. In *ABKCO*, the Court of Appeals held that a judgment debtor's right to payment under a licensing agreement was "property" because, like Markazi's interest in the right to payment held by Clearstream, it was an assignable interest. *ABKCO*, 39 N.Y.2d at 674-75, 350 N.E.2d at 900-02. And at least one New York court has confirmed that a bank account—like the Markazi, UBAE, and blocked sundry accounts at Clearstream in Luxembourg—was subject to turnover because "[t]he property of the depositor is the indebtedness of the bank to it." *Gryphon Domestic VI, LLC v. APP Int'l Fin. Co., B.V.*, 41 A.D.3d 25, 36, 836 N.Y.S.2d 4, 12 (N.Y. App. Div. 1st Dep't 2007) (internal quotation marks omitted).

Property not in the possession of judgment debtor. Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest . . . where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment to a designated sheriff.

N.Y. C.P.L.R. § 5225(b).

Relying on this provision, the plaintiffs seek turnover of Iran's right to payment in the amount of $1.68 billion, represented as a positive account balance and recorded on the books of Clearstream in Luxembourg. The district court concluded that this asset's location in Luxembourg is fatal to the plaintiffs' turnover claims. *Peterson II*, 2015 WL 731221, at *10, 2015 U.S. Dist. LEXIS 20640, at *31 ("The FSIA does not allow for attachment of property outside of the United States."). We disagree.

The FSIA does not by its terms provide execution immunity to a foreign sovereign's extraterritorial assets. *See* 28 U.S.C. § 1609 ("[T]he property *in the United States* of a foreign state shall be immune from attachment arrest and execution . . . ." (emphasis added)). In *NML Capital*, the Supreme Court squarely

rejected the argument that any common law execution immunity afforded to "a foreign state's extraterritorial assets" survived the enactment of the FSIA:

> [We identify] no case holding that, before the Act, a foreign state's extraterritorial assets enjoyed absolute execution immunity in United States courts. No surprise there. Our courts generally lack authority in the first place to execute against property in other countries, so how could the question ever have arisen?

134 S. Ct. at 2257 (holding that § 1609 does not immunize "a foreign sovereign's extraterritorial assets" from post-judgment discovery).

Notwithstanding the Supreme Court's rhetorical observation, the question whether courts sitting in New York have the authority to execute against property in other countries arose in *Koehler*, 544 F.3d 78, in which we were asked to decide whether C.P.L.R. § 5225(b) applies extraterritorially. There, a judgment creditor sought to execute against stock certificates owned by a judgment debtor but held in Bermuda by a third-party garnishee. *Id.* at 80-81. "The district court concluded that stock certificates in general must be located within the state in order to be attached . . . ." *Id.* at 86. On appeal, however, we found that this raised an important and unsettled question of state law; accordingly, we certified the issue to the New York Court of Appeals. *Id.* at 87-88.

The Court of Appeals accepted certification and, closely divided, "h[e]ld that a New York court with personal jurisdiction over a defendant may order him to turn over out-of-state property regardless of whether the defendant is a judgment debtor or a garnishee." *Koehler v. Bank of Berm. Ltd.*, 12 N.Y.3d 533, 541, 911 N.E.2d 825, 831 (2009). The court observed that "CPLR article 52 contains no express territorial limitation barring the entry of a turnover order that requires a garnishee to transfer money or property into New York from another state or country." *Id.* at 539, 911 N.E.2d at 829. Turning to recent legislative amendments, the court determined that the New York State "[l]egislature intended CPLR article 52 to have extraterritorial reach." *Id.* The court's holding turned on the exercise of *in personam* jurisdiction; a court sitting in New York with personal jurisdiction over a party may order that party "to bring property into the state." *Id.* at 540, 911 N.E.2d at 830 ("[T]he key to the reach of the turnover order is personal jurisdiction over a particular defendant.").

Following *NML Capital*, 134 S. Ct. at 2256-57, the FSIA appears to be no impediment to an order issued pursuant to *Koehler* directing Clearstream— should the court have personal jurisdiction over it—to bring the Markazi-owned asset held in Luxembourg to New York State. Section 1604's grant of

jurisdictional immunity applies only to "a foreign state," which Clearstream of course is not.  28 U.S.C. § 1604.  Section 1609's grant of execution immunity applies only to assets located "in the United States," which the Luxembourg right to payment is not.  28 U.S.C. § 1609.  And, as noted, the Supreme Court's view set forth in *NML Capital* appears unequivocal:  "[A]ny sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text.  Or it must fall."  134 S. Ct. at 2256.

Each of the many cases cited by the defendants for the proposition that a foreign sovereign's extraterritorial assets are absolutely immune from execution were decided before the Supreme Court's decision in *NML Capital*, which made clear that such cases predating *NML Capital* are no longer binding on this discrete point.  *See EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 208 (2d Cir. 2012) ("We recognize that a district court sitting in Manhattan does not have the power to attach Argentinian property in foreign countries."); *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009) ("[T]he property that is subject to attachment and execution must be property in the United States of a foreign state . . . ." (internal quotation marks omitted)).  Following *NML Capital*, this body of former case law is of no help to the defendants.  As the Supreme

Court instructed, "even if [the defendants] were right about the scope of the common-law execution-immunity rule, then it would be obvious that the terms of § 1609 execution immunity are narrower, since the text of that provision immunizes only foreign-state property '*in the United States*.'" *NML Capital*, 134 S. Ct. at 2257 (emphasis in original).

*NML Capital* and *Koehler* do not, however, affect our long-standing view that "[t]he FSIA provides the exclusive basis for obtaining subject matter jurisdiction *over a foreign state*." *Kirschenbaum*, 830 F.3d at 122 (emphasis added); *see also NML Capital*, 134 S. Ct. at 2256-58 (concerning execution jurisdiction). Here, though, the putative exercise of *in personam* jurisdiction concerns Clearstream—the party in possession of the asset at issue—which is not itself a sovereign and therefore does not possess sovereign immunity.

Nonetheless, *NML Capital* and *Koehler*, when combined, do authorize a court sitting in New York with personal jurisdiction over a non-sovereign third party to recall to New York extraterritorial assets owned by a foreign sovereign. Had *Koehler* arisen in the context of an exercise of *in personam* jurisdiction over a foreign sovereign—it did *not*—the FSIA's grant of jurisdictional immunity would supersede contrary state law. *See Peterson*, 627 F.3d at 1130 (applying state law

"insofar as it does not conflict with the FSIA").  As it was decided, however, *Koehler* does not appear to us to be inconsistent with the FSIA as interpreted by the Supreme Court in *NML Capital*.

At least one of our sister circuits has, without considering the issue in any detail, suggested the contrary conclusion: that even after *NML Capital,* a foreign sovereign's extraterritorial assets remain absolutely immune from execution.  In *Rubin v. Islamic Republic of Iran*, 830 F.3d 470 (7th Cir. 2016), the Seventh Circuit remarked that before a foreign sovereign's assets are "even potentially subject to attachment and execution," it must be shown that the assets are "within the territorial jurisdiction of the district court."  *Id.* at 475 (citing *NML Capital*, 134 S. Ct. at 2257 ("Our courts generally lack authority in the first place to execute against property in other countries . . . .")).  The Seventh Circuit's comment is unavailing to the defendants here.  As an initial matter, it is not evident that an exercise of *in personam* jurisdiction over a non-sovereign pursuant to *Koehler* is inconsistent with the Seventh Circuit's statement concerning the exercise of "territorial jurisdiction" in the context of an *in rem* proceeding.  *Id.*; *see also Rubin v. Islamic Republic of Iran*, 33 F. Supp. 3d 1003, 1006 (N.D. Ill. 2014) ("Plaintiffs now seek to collect on [judgments against Iran] *by attaching* alleged assets of Iran . . . ."

(emphasis added)), *aff'd*, 830 F.3d 470 (7th Cir. 2016), *cert. granted*, 137 S. Ct. 2326 (2017).

Moreover, we do not understand the Supreme Court's observation that "[o]ur courts generally lack authority in the first place to execute against property in other countries," *NML Capital*, 134 S. Ct. at 2257, to foreclose that possibility.[20] Indeed, Justice Scalia's observation was made in the context of noting that no court had ever before held that "a foreign state's extraterritorial assets enjoyed absolute execution immunity in United States courts." *Id.* And as we have noted, even if such a rule had existed at common law, "it would be obvious that the terms of § 1609 execution immunity are narrower, since the text of that provision immunizes only foreign-state property '*in the United States*.'" *Id.* (emphasis in original). "So . . . § 1609 execution immunity . . . [does] not shield . . . a foreign sovereign's extraterritorial assets." *Id.*

---

[20] The Supreme Court observed that "a writ of execution . . . can be served anywhere within the state in which the district court is held." *NML Capital*, 134 S. Ct. at 2257 (alteration omitted) (quoting 12 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 3013, p. 156 (2d ed. 1997) [hereinafter "Wright & Miller"]). That statement of law pertains to service and is not a barrier to a court's exercise of jurisdiction in accordance with the jurisdictional boundaries established by the state in which the court resides. *See* Wright & Miller § 3012 ("Many questions that arise in the enforcement of a money judgment will not be answered in the federal statutes and resort must be had to state law. The relevant law is that of the state in which the district court is held.").

We think that the Supreme Court's decision in *NML Capital* counsels in favor of part of the reasoning suggested by the Ninth Circuit's decision in *Peterson*, 627 F.3d 1117, itself a pre–*NML Capital* case. There, judgment creditors of Iran sought to execute against "Iran's rights to payment from CMA CGM," a French shipping company indebted to Iran. *Id.* at 1121. The Ninth Circuit held that the right to payment was not "property in the United States" within the meaning of § 1610(a) and was, therefore, "immune from execution." *Id.* at 1130. The court appeared to reach that conclusion based on the FSIA itself, *see id.* (citing 28 U.S.C. § 1610(a)), which reasoning, as explained, was vitiated by *NML Capital.*

But the Ninth Circuit also turned to state law as directed by Federal Rule of Civil Procedure 69(a). *Id.* at 1130-31 (noting that "California enforcement law authorizes a court to 'order the judgment debtor to assign to the judgment creditor . . . all or part of a right to payment due or to become due'" (quoting Cal. Civ. Proc. Code § 708.510(a))). In particular, the Ninth Circuit relied on *Philippine Export & Foreign Loan Guar. Corp. v. Chuidian*, 218 Cal. App. 3d 1058, 267 Cal. Rptr. 457 (6th Dist. 1990), for the proposition that "the location of a right to payment . . . is the location of the debtor," *Peterson*, 627 F.3d at 1131 (citing

64

*Philippine Export*, 218 Cal. App. 3d 1058, 267 Cal. Rptr. 457). The state appellate court's decision in *Philippine Export* also held that California's state execution law does not apply extraterritorially. *Philippine Export*, 218 Cal. App. 3d at 1099, 267 Cal. Rptr. at 481. Citing that decision, the Ninth Circuit concluded that "a foreign state defendant's rights to payment from third-party debtors are assignable only if those 'debtors [] reside in the United States.'" *Peterson*, 627 F.3d at 1131 (quoting *Philippine Export*, 218 Cal. App. 3d at 1099, 267 Cal. Rptr. at 481).

Although the Ninth Circuit's decision appears to have rested on its pre-*NML Capital* understanding of the FSIA, its decision and citation to *Philippine Export* suggest an alternative approach that is in step with our reconciliation of *NML Capital* and *Koehler*. Were one to except the part of the Ninth Circuit's opinion that did not survive *NML Capital*, the principal difference between the Ninth Circuit's decision in *Peterson* and our disposition of this case might be viewed as one of state law. *Compare Philippine Export*, 218 Cal. App. 3d at 1099, 267 Cal. Rptr. at 480 (declining to exercise extraterritorial personal jurisdiction because, under California law, "the limits which generally exist upon the right to execute . . . apply in a judgment debtor proceeding such as this" (citing Cal. Civ. Proc. Code § 708.510 cmt. (West 1987) (Legislative Committee Comments,

Assembly, 1982 Addition))), *with Koehler*, 12 N.Y.3d at 539, 911 N.E.2d at 829 (determining that the New York State "[l]egislature intended CPLR article 52 to have extraterritorial reach").

On remand, the district court should determine in the first instance whether it has personal jurisdiction over Clearstream.[21]  If it answers that question in the affirmative, then the court should determine if a barrier exists to an exercise of *in personam* jurisdiction to recall to New York State the right to payment held by Clearstream in Luxembourg, whether for reasons of, *inter alia*, state law,[22] federal law, international comity,[23] or for any other reason.

---

[21] Although the district court concluded in *Peterson I* that it had general personal jurisdiction over Clearstream, *Peterson I*, 2013 WL 1155576, at *18-19, 2013 U.S. Dist. LEXIS 40470, at *87-91 (finding both general and specific personal jurisdiction), the district court explicitly declined in *Peterson II* to decide whether it did here, *Peterson II*, 2015 WL 731221, at *1, 2015 U.S. Dist. LEXIS 20640, at *4.  We think it prudent for the district court to decide in the first instance whether personal jurisdiction over Clearstream exists in the context of the events relevant to this case.

[22] Such barriers might include the "separate entity" doctrine.  *See Motorola Credit Corp. v. Standard Chartered Bank*, 24 N.Y.3d 149, 21 N.E.3d 223 (2014).

[23] For example, "in the event that the district court concludes [on remand] that the exercise of personal jurisdiction over [Clearstream] is appropriate," the court may "undertake a comity analysis before ordering [Clearstream] to comply with the [putative order]." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 138 (2d Cir. 2010).  Such an analysis would likely follow "the framework provided by . . . the Restatement (Third) of Foreign Relations Law." *Id.* at 139.  We leave it to the parties to develop and the district court to review the requisite record indicating whether "a court order will infringe on sovereign interests of a foreign state." *Id.*

Should that asset be recalled, it may, upon being produced in New York, qualify as an asset "*in the United States* of a foreign state" and, if so, it would be afforded execution immunity as such. 28 U.S.C. § 1609 (emphasis added). Accordingly, the district court will likely be required to determine, if and when it reaches that juncture, whether the asset that comes to be "in the United States" is subject to the execution-immunity exceptions relied on by the plaintiffs, 28 U.S.C. § 1610(a)(7), (g)(1); TRIA § 201(a). The defendants should, of course, be permitted to raise appropriate rebuttals at that time if they so choose.

We are cognizant of the conundrum apparently posed by *NML Capital* and *Koehler* when read in tandem. The FSIA "aimed to facilitate and depoliticize litigation against foreign states and to minimize irritations in foreign relations arising out of such litigation." *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993) (internal quotation marks omitted). We are not at all sure that *NML Capital* when read in light of the law established by *Koehler* furthers that goal. But if we are correct in our analysis, any such problem is one for the Supreme Court or the political branches—not this Court—to resolve.[24]

---

[24] The Supreme Court noted that its decision in *NML Capital* might present "worrisome international-relations consequences," "provoke reciprocal adverse treatment of the United States in foreign courts," or "threaten harm to the United States' foreign relations

Here, we attempt only to apply the law as we find it: The authority of courts sitting in New York with personal jurisdiction over a non-sovereign third party to order that third-party garnishee to produce in New York an extraterritorial asset seems clear enough. *Koehler*, 12 N.Y.3d at 540, 911 N.E.2d at 830. Whether that extraterritorial asset is owned by a foreign sovereign is of no moment, because the FSIA's grant of execution immunity does not extend to assets located abroad. *NML Capital*, 134 S. Ct. at 2257.

Moreover, we think that the two-step process called for by these cases— first recalling the asset at issue, and second, proceeding with a traditional FSIA analysis—is unlikely to open the proverbial floodgates to a wave of turnover claims seeking to execute against heretofore-unreachable extraterritorial assets. Even if those assets are in the possession of a third party over whom or which a court sitting in New York has personal jurisdiction, those assets still must not be subject to execution immunity upon being recalled to New York State. In that respect, the FSIA contains several limiting principles, such as the requirement that any asset subject to execution must have been "used for a commercial

more generally." *NML Capital*, 134 S. Ct. at 2258 (internal quotation marks omitted). It nonetheless expressed the view that "[t]hese apprehensions are better directed to that branch of the government with authority to amend the Act." *Id.* We are similarly constrained.

activity in the United States."  28 U.S.C. § 1610(a).  Similarly, the TRIA contains its own limiting provisions, including the requirement that any asset subject to turnover be "blocked," a term of art imbued with precise meaning.  TRIA § 201(a); *see also Smith v. Fed. Reserve Bank of N.Y.,* 346 F.3d 264, 267-69 (2d Cir. 2003) (defining "blocked" in the context of the TRIA).  These and other constraints have frequently proven to be barriers to execution on foreign sovereign assets.  *See, e.g., Calderon-Cardona v. Bank of N.Y. Mellon,* 770 F.3d 993, 999 (2d Cir. 2014) (holding that attachment was unavailable under the TRIA because North Korea was not "designated as a state sponsor of terrorism under . . . the Export Administration Act of 1979 . . . or . . . the Foreign Assistance Act of 1961" at the time of judgment (internal quotation marks omitted)); *Hausler v. JP Morgan Chase Bank, N.A.,* 770 F.3d 207, 212 (2d Cir. 2014) (per curiam) (determining that the property at issue did not qualify as the "blocked asset of" a foreign sovereign); *Aurelius Capital Partners,* 584 F.3d at 130-31 (holding that assets were not subject to execution under the FSIA because the assets at issue were not "used for a commercial activity," as required by the Act); *Bank of N.Y. v. Rubin,* 484 F.3d 149, 150 (2d Cir. 2007) (per curiam) (concluding that the assets at issue were not "blocked assets" subject to turnover under the TRIA).

Indeed, these or other limitations may ultimately prevent the plaintiffs in this case from obtaining turnover of the asset at issue, should it be recalled to New York State pursuant to an exercise of the court's *in personam* jurisdiction. As but one example, one of the defendants argues on appeal that the asset at issue does not qualify for the execution-immunity exceptions enumerated in 28 U.S.C. § 1610(a) because it was not "used for a commercial activity in the United States." UBAE Br. at 37-39. Whether that is so is independent of whether the asset comes to be located "in the United States." *See* 28 U.S.C. § 1610(a) ("The property in the United States of a foreign state, . . . used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, . . . if [additional specified requirements are satisfied]."). While we need not, and therefore do not, consider the applicability of these barriers at this time, we wish to make clear that the plaintiffs are by no means assured success upon remand.

## CONCLUSION

To summarize, for the foregoing reasons, we conclude as follows:

1. Plain error as to the application of the Clearstream settlement

agreement to those plaintiffs who were not parties to *Peterson I* requires

vacatur of the judgment of dismissal and remand with respect to those plaintiffs' non-turnover claims brought against Clearstream.

2. Excepting those plaintiffs who were not parties to *Peterson I*, the Clearstream settlement agreement released the plaintiffs' non-turnover claims brought against Clearstream. The district court therefore properly dismissed those claims.

3. Whether the UBAE settlement agreement is applicable to the plaintiffs' non-turnover claims brought against UBAE is, under the language of the agreement, unclear. Those claims were, therefore, dismissed by the district court in error. Accordingly, we vacate and remand that part of the district court's judgment of dismissal.

4. The UBAE settlement agreement did not release the plaintiffs' non-turnover claims brought against Markazi. Accordingly, we vacate and remand that part of the district court's judgment of dismissal.

5. The district court correctly determined that the asset at issue is a right to payment held by Clearstream in Luxembourg. It also, therefore, properly dismissed JPMorgan from this action.

6. The district court prematurely dismissed the amended complaint for lack of subject-matter jurisdiction. *Cf. Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250 (2014); *Koehler v. Bank of Berm. Ltd.*, 12 N.Y.3d 533, 911 N.E.2d 825 (2009). On remand the district court should consider whether it has personal jurisdiction over Clearstream. If the court answers that question in the affirmative, then it should determine whether any provision of state or federal law prevents the court from recalling, or the plaintiffs from receiving, the asset.

Accordingly, we AFFIRM the district court's judgment in part, VACATE it in part, and REMAND for further proceedings consistent with this opinion.

**APPENDIX**

The following parties are plaintiffs in this appeal: Deborah D. Peterson, personal representative of the Estate of James C. Knipple, Terry Abbott, John Robert Allman, Ronny Kent Bates, James Baynard, Jess W. Beamon, Alvin Burton Belmer, Richard D. Blankenship, John W. Blocker, Joseph John Boccia, Jr., Leon Bohannon, John Bonk, Jr., Jeffrey Joseph Boulos, John Norman Boyett, William Burley, Paul Callahan, Mecot Camara, Bradley Campus, Johnnie Ceasar, Robert Allen Conley, Charles Dennis Cook, Jolumy Len Copeland, David Cosner, Kevin Coulman, Rick Crudale, Russell Cyzick, Michael Devlin, Nathaniel Dorsey, Timothy Dunnigan, Bryan Earle, Danny R. Estes, Richard Andrew Fluegel, Michael D. Fulcher, Sean Gallagher, George Gangur, Randall Garcia, Harold Ghumm, Timothy Giblin, Michael Gorchinski, Richard Gordon, Davin M. Green, Thomas Hairston, Michael Haskell, Mark Anthony Helms, Stanley G. Hester, Donald Wayne Hildreth, Richard Holberton, Dr. John Hudson, Maurice Edward Hukill, Edward Iacovino, Jr., Paul Innocenzi, III, James Jackowski, Jeffrey Wilbur James, Nathaniel Walter Jenkins, Edward Anthony Johnston, Steven Jones, Thomas Adrian Julian, Thomas Keown, Daniel Kluck, Freas H. Kreischer, III, Keith Laise, James Langon, IV, Steven LaRiviere, Richard Lemnah, Paul D. Lyon,

Jr., John Macroglou, Charlie Robert Martin, Michael Scott LaRiviere, Joseph R. Livingston, III, Samuel Maitland, Jr., David Massa, John McCall, James E. McDonough, Timothy R. McMahon, Richard Menkins, II, Ronald Meurer, Joseph Peter Milano, Joseph Moore, Harry Douglas Myers, David Nairn, John Arne Olson, Joseph Albert Owens, Connie Ray Page, Ulysses Gregory Parker, Olson J. Ronald, (Estate of) Sigurd Olson, David Owens, Deanna Owens, Frances Owens, James Owens, Steven Owens, Connie Mack Page, Judith K. Page, Lisa Menkins Palmer, Geraldine Paolozzi, Maureen Pare, (Estate of) Mary A. Cook, Alan Tracy Copeland, Betty Copeland, Donald Copeland, Blanche Corry, Harold Cosner, Jeffrey Cosner, Leanna Cosner, (Estate of) Marva Lynn Cosner, Cheryl Cossaboom, Bryan Thomas Coulman, Christopher J. Coulman, Dennis P. Coulman, Lorraine M. Coulman, Robert D. Coulman, Robert Louis Coulman, (Estate of) Angela Josephine Smith, Bobbie Ann Smith, Cynthia Smith, Donna Marie Smith, Erma Smith, Holly Smith, Ian Smith, Janet Smith, Joseph K. Smith, III, Joseph K. Smith, Jr., Keith Smith, Shirley L. Smith, Tadgh Smith, Terrence Smith, Timothy B. Smith, Jocelyn J. Sommerhof, John Sommerhof, William J. Sommerhof, Douglas Spencer, Christy Williford Stelpflug, Joseph Stelpflug, Kathy Nathan Stelpflug, Laura Barfield Stelpflug, Peggy Stelpflug, William

Stelpflug, Horace Stephens, Sr., Joyce Stephens, Keith Stephens, Dona Stockton, (Estate of) Donald Stockton, Richard Stockton, Irene Stokes, Nelson Stokes, Jr., (Estate of) Nelson Stokes, Sr., Robert Stokes, Gwenn Stokes-Graham, Marcus D. Sturghill, Marcus L. Sturghill, Jr., NaKeisha Lynn Sturghill, Doreen Sundar, Margaret Tella, Susan L. Terlson, Mary Ellen Thompson, Adam Thorstad, Barbara Thorstad, James Thorstad, Jr., James Thorstad, Sr., John Thorstad, Ryan Thorstad, Charlita Martin Covington, Amanda Crouch, Marie Crudale, Eugene Cyzick, Lynn Dallachie, Anne Deal, Lynn Smith Derbyshire, Theresa Desjardins, Christine Devlin, Daniel Devlin, Gabrielle Devlin, Richard Devlin, Sean Devlin, Rosalie Donahue (Milano), Ashley Doray, Rebecca Doss, Chester Dmmigan, Elizabeth Ann Dunnigan, Michael Dunnigan, William Dunnigan, Claudine Dunnigan, Pedro Alvarado, Jr., Dennis Jack Anderson, Timothy Brooks, Michael Harris, Donald R. Pontillo, John E. Selbe, Willy G. Thomson, Terance J. Valore, (Estate of) David L. Battle, (Estate of) Matilde Hernandez, Jr., (Estate of) John Muffler, (Estate of) John Jay Tishmack, (Estate of) Leonard Warren Walker, (Estate of) Walter Emerson Wint, Jr., (Estate of) James Yarber, Angel Alvarado, Geraldo Alvarado, Grisselle Alvarado, Luis Alvarado, Luisa Alvarado, Maria Alvarado, Marta Alvarado, Minerva Alvarado, Yolanda Alvarado, Arlington

Ferguson, Janet Williams, Orlando M. Valore, Jr., Bill Macroglou, Thomas D. Brown, Jr., Gwen Woodcock, (Estate of) Warner Gibbs, Jr., Zoraida Alvarado, Hilton Ferguson, Johnny Williams, Neale Scott Bolen, Faith Albright, Jeanette Odom, Lisa Burleyson, Freda Gibbs Hutcherson, Tull Andres Alvarado, Linda Sandback Fish, Rhonda Williams, (Estate of) Moses Arnold, Jr., Gary Wayne Allison, Deborah Vogt, Mecot Echo Camara, Larry Gibbs, Cheryl Bass, Nancy Brocksbank Fox, Ronald Williams, Lolita M. Arnold, C. Keith Bailey, Christopher Burnette, Dale Comes, Marcus A. Lewis, Edward J. Brooks, Tia Fox, Ruth Williams, Lisa Ann Beck, Vina S. Bailey, Connie Decker, Tommy Comes, (Estate of) Warner Gibbs, Sr., Patricia A. Brooks, Tammy Freshour, Scipio J. Williams, Betty J. Bolen, Charles E. Bailey, Gwen Burnette, (Estate of) Bert Daniel Corcoran, (Estate of) Janet Yvonne Lewis, Wanda Ford, Ruby Fulcher, Wesley Williams, Keith Edwin Bolen, Karen L. Cooper, Kathleen Collins, Earl Guy, Bennie Harris, Barbara Gallagher, Delma Williams-Edwards, Sheldon H. Bolen, Mark Bartholomew, Catherine Corcoran, Joan M. Crawford, Rose Harris, Brian Gallagher, Tony Williamson, Sharla M. Korz, Teresa Bartholomew, (Estate of) Robert Alton Corcoran, Ian Guy, Marcy Lynn Parson, (Estate of) James Gallagher, Jewelene Williamson, (Estate of) James Silvia, Crystal Bartholomew,

(Estate of) Keith Alton Corcoran, Eddie Guy, Jr., Douglas Pontillo, James Gallagher, Jr., Michael Winter, Lynne Michol Spencer, Jerry Bartholomew, Robert Brian Corcoran, Adam Guy, Don Selbe, Kevin Gallagher, Barbara Wiseman, Catherine Bonk, Joyce Bartholomew, Elizabeth Ann Ortiz, (Estate of) Douglas Held, Eloise F. Selbe, Michael Gallagher, Phyllis Woodford, Kevin Bonk, Arthur Johnson, Michael Corrigan, (Estate of) Sondra Lou Held, James Selbe, Dimitri Gangur, Kelly B. Smith, Thomas Bonk, Robert Bragg, (Estate of) Andrew Davis, Patrick Held, Belinda Skarka, Mary Gangur, Keysha Tollivel, John Bonk, Sr., Carolyn Davis, Thomas Held, Allison Thomson, Jess Garcia, Ronald Garcia, Marion DiGiovanni, Jennifer Davis, Thomas Hoke, Johnny Thompson, Betty Ann Thurman, Roxanne Garcia, Sherry Lynn Fiedler, (Estate of) Frederick Douglass, Glenn W. Hollis, Deborah True, Barbara Tingley, Russell Garcia, Marilou Fluegel, Shirley Douglass Miller, Jane Costa, Janice Valore, Richard L. Tingley, Violet Garcia, Robert Fluegel, Susan Baker, (Estate of) Ann Hollis, Janice Thorstad Edquist, Russell Tingley, Suzanne Perron Garza, Thomas A. Fluegel, Regina Periera, Jack Darrell Hunt, Mary Ruth Ervin, Mary Ann Turek, Jeanne Gattegno, Evans Hairston, Richard Dudley, Mendy Leight Hunt, Barbara Estes, Karen Valenti, Arlene Ghumm, Felicia Hairston, Toledo Dudley, Molly Fay

Hunt, Charles Estes, Anthony Vallone, Ashley Ghumm, Julia Bell Hairston, Sherry Latoz, (Estate of) John Ingalls, Frank Estes, Bill Ghumm, Henry Durban Hukill, Cynthia Blankenship, James Ingalls, Lori Fansler, Donald H. Vallone, Edward Ghumm, Mark Andrew Hukill, Ginger Tuton, Joseph Ingalls, Angela Dawn Farthing, Timothy Vallone, Hildegard Ghumm, Matthew Scott Hukill, Scott Dudley, Kevin Jiggetts, Leona Mae Vargas, (Estate of) Jedaiah Ghumm, Melissa Hukill, David Eaves, Donald Long, Denise Voyles, Jesse Ghumm, Meredith Ann Hukill, (Estate of) Roy Edwards, Robert Lynch, Ila Wallace, Leroy Ghumm, Mitchell Charles Hukill, Cindy Colasanti, (Estate of) Manual Massa, Sr., Kathryn Thorstad Wallace, Moronica Ghumm, Monte Hukill, (Estate of) Barbara Edwards, Tim McCoskey, Barbara Thorstad Warwick, Donald Giblin, Virginia Ellen Hukill, (Estate of) Penny Garner, Ronald L. Moore, Linda Washington, Jeanne Giblin, Catherine Bonk Hunt, (Estate of) David D. Gay, Alan C. Anderson, Vancine Washington, Michael Giblin, Storm Jones, Gail Black, Thelma Anderson, Kenneth Watson, Tiffany Giblin, Penni Joyce, (Estate of) Neva Jean Gay, (Estate of) Stephen B. Bland, Diane Whitener, Valerie Giblin, Jeff Kirkwood, Ronald Gay, (Estate of) Frank Bland, Daryl Wigglesworth, William Giblin, Shirley Kirkwood, Timothy Gay, James Bland, Darren A. Wigglesworth, Thad

Gilford-Smith, Carl A. Kirkwood, Jr., Rebecca Cordell, Ruth Ann Bland, Henry Wigglesworth, Rebecca Gintonio, Carl Kirkwood, Sr., (Estate of) David D. Gay, Sr., (Estate of) Laura V. Copeland, Mark Wigglesworth, Dawn Goff, Patricia Kronenbitter, Ronald Duplanty, Robyn Wigglesworth, Christina Gorchinski, Bill Laise, (Estate of) Sean F. Estler, Sandra Wigglesworth, Judy Gorchinski, Betty Laise, Keith Estler, Shawn Wigglesworth, Kevin Gorchinski, Kris Laise, Mary Ellen Estler, Dianne Stokes Williams, Valerie Gorchinski, Louis C. Estler, Jr., Gussie Martin Williams, Alice Gordon, (Estate of) Benjamin E. Fuller, Joseph Gordon, Elaine Allen, Linda Gordon, Ernest C. Fuller, (Estate of) Norris Gordon, John Gibson, Holly Gibson, Maurice Gibson, (Estate of) Michael Hastings, Joyce Hastings, (Estate of) Paul Hein, Christopher Hein, Jo Ann Hein, Karen Hein, Victor Hein, Jacqueline M. Kuncyz, (Estate of) John Hendrickson, John Hendrickson, Tyson Hendrickson, Deborah Ryan, (Estate of) Bruce Hollingshead, Melinda Hollingshead, Renard Manley, James Macroglou, Lorraine Macroglou, Kathy McDonald, Edward J. McDonough, Edward W. McDonough, Sean McDonough, Deborah Rhosto, (Estate of) Luis Rotondo, (Estate of) Rose Rotondo, (Estate of) Phyllis Santoserre, Anna Marie Simpson, Renee Eileen Simpson, Robert Simpson, Larry Simpson, Sr., Sally Jo Wirick,

(Estate of) Michael R. Massman, Angela Massman, Kristopher Massman, Lydia Massman, Nicole Gomez, Patricia Lou Smith, (Estate of) Louis Melendez, Douglas J. Melendez, Johnny Melendez, Zaida Melendez, Johnny Melendez, Jr., (Estate of) Michael D. Mercer, Sarah Mercer, Samuel Palmer, Robin Nicely, (Estate of) Juan Rodriguez, Louisa Puntonet, Robert Rucker, (Estate of) Billy San Pedro, Cesar San Pedro, Guillermo San Pedro, Javier San Pedro, Sila San Pedro, Thurnell Shields, Emmanuel Simmons, (Estate of) James Surch, Will Surch, Patty Barnett, Bradley Ulich, Jeanette Dougherty, Marilyn Peterson, (Estate of) Eric Walker, Tena Walker-Jones, Ronald E. Walker, Ronnie Walker, Galen Weber, (Estate of) Obrian Weekes, Ianthe Weekes, Keith Weekes, Meta Weekes, Anson Edmond, Arnold Edmond, Hazel Edmond, Wendy Edmond, (Estate of) Dennis Lloyd West, Kathy West, (Estate of) John Weyl, Sharon Rowan, Kelly Bachlor, Robin Brock, Morgan W. Rowan, Nelson Weyl, Joseph A. Barile, Angela E. Barile, Michael Barile, Andrea Ciarla, Ann Marie Moore, Angela Yoak, John Becker, (Estate of) Anthony Brown, John Brown, Rowel Brown, Sulba Brown, Vara Brown, Marvine McBride, LaJuana Smith, Rodney E. Burns, Eugene Burns, David Burns, Jeannie Scaggs, Daniel Cuddeback, Jr., Barbara Cuddeback, Daniel Cuddeback, Sr., Michael Episcopo, Randy Gaddo, Louise Gaddo Blattler, Peter

Gaddo, Timothy Gaddo, (Estate of) William R. Gaines, Jr., Michael A. Gaines,

William R. Gaines, Sr., Carolyn Spears, Carole Weaver, (Estate of) Virgel

Hamilton, Gloria Hamilton, Bruce S. Hastings, Maynard Hodges, Mary Jean

Hodges, Kathy Hodges, Loretta Brown, Cindy Holmes, Shana Saul, Daniel Joy,

Daniel Kremer, (Estate of) Thomas Kremer, (Estate of) Christine Kremer, Joseph

T. Kremer, Jacqueline Stahrr, (Estate of) David A. Lewis, Betty Lewis, Jerry L.

Lewis, Scott M. Lewis, Paul Martinez, Sr., Teresa Gunther, Alphonso Martinez,

Daniel L. Martinez, Michael Martinez, Paul Martinez, Jr., Tomasita L. Martinez,

Esther Martinez-Parks, Susanne Yeoman, (Estate of) Jeffrey B. Owen, Jean G.

Owen, Steven Owen, (Estate of) Michael L. Page, Albert Page, Janet Page, Joyce

Clifford, David Penosky, Joseph Penosky, Christian R. Rauch, Leonard Paul Tice,

(Estate of) Burton Wherland, Gregory Wherland, Sarah Wherland, Sharon Davis,

Charles F. West, Charles H. West, Rick West, Kimmy Wherland, Janet LaRiviere,

John M. LaRiviere, Lesley LaRiviere, Michael LaRiviere, Nancy LaRiviere,

Richard LaRiviere, (Estate of) Richard G. Lariviere, Robert LaRiviere, William

LaRiviere, Cathy L. Lawton, Heidi Crudale LeGault, (Estate of) Clarence

Lemnah, Etta Lemnah, Fay Lemnah, Harold Lemnah, Marlys Lemnah, Robert

Lemnah, Ronald Lemnah, Annette R. Livingston, Joseph R. Livingston, IV,

(Estate of) Joseph R. Livingston, Jr., Robin M. Lynch, Earl Lyon, Francisco Lyon, June Lyon, Maria Lyon, Paul D. Lyon, Sr., Valerie Lyon, Heather Macroglou, Kathleen Devlin Mahoney, Kenty Maitland, Leysnal Maitland, Samuel Maitland, Sr., Shirla Maitland, Virginia Boccia Marshall, John Martin, Pacita Martin, Renerio Martin, Ruby Martin, Shirley Martin, Mary Mason, Christina Massa, Edmund Massa, Joao "John" Massa, Jose "Joe" Massa, Manuel Massa, Jr., Ramiro Massa, Mary McCall, (Estate of) Thomas McCall, Valerie McCall, Gail McDermott, Julia A. McFarlin, George McMahon, Michael McMahon, Patty McPhee, Darren Menkins, Gregory Menkins, Margaret Menkins, Richard H. Menkins, Jay T. Meurer, John Meurer, John Thomas Meurer, Mary Lou Meurer, Michael Meurer, Penny Meyer, Angela Angela Milano, Peter Milano, Jr., Earline Miller, Henry Miller, Patricia Miller, Helen Montgomery, Betty Moore, Harry Moore, Kimberly Moore, Mary Moore, Melissa Lea Moore, (Estate of) Michael Moore, Elizabeth Phillips Moy, Debra Myers, Geneva Myers, Harry A. Myers, Billie Ann Nairn, Campbell J. Nairn, III, (Estate of) Campbell J. Nairn, Jr., William P. Nairn, Richard Norfleet, Deborah O'Connor, Pearl Olaniji, (Estate of) Bertha Olson, Karen L. Olson, Randal D. Olson, Roger S. Olson, John W. Nash, Rose Ann Nash, (Estate of) Frank E. Nash, William H. Nash, Mark S. Nash, Frank

E. Nash, Jr., Jaklyn Milliken, Rosemarie Vliet, Cataldo Anthony Nashton, Claudio Comino, Mark Nashton, Myles Nashton, Jennifer Page Nelson, Timothy Price, (Estate of) Betty Lou Price, James M. Puckett, Ronald Putnam, Bruce H. Richardson, Bernice Rivers, Barbara Ann Russell, Robert Emmett Russell, Glenn Edward Russell, Charles Edward Russell, Jr., Jean Louis Brown, Nancy MacDonald, Diane Carol Higgins, (Estate of) Thomas Russell, Thomas Rutter, John Santos, Raoul Santos (father), Mary Santos, Donna Duffy, Mary Cropper, Doreen Callanan, Jean Winner, Kevin Santos, Raoul Santos (brother), Joseph Richard Schneider, Morris Schneider, Jacqueline Gibson, Paul Segarra, Steven Shapuras, David W. Sharp, Charles Simmons, (Estate of) Thomas D. Stowe, David Stowe, Barbara Stowe, Priscilla Stowe, Samantha Stowe, Donna Baloga, Edward J. Streker, (Estate of) Henry Townsend, Jr., Lillian Townsend, Henry Townsend, Marcia C. Townsend-Tippett, Valerie Tatum, Cynthia Green, Kawanna Duncan, John Turner, Judith Turner, Thomas Andrew Walsh, Charles Walsh, Ruth Walsh, Pat Campbell, Rachel Walsh, Timothy Walsh, Michael Walsh, (Estate of) Sean Walsh, Patricia Fitzgerald Washington, Gerald Foister, (Estate of) Tandy W. Wells, Danny Holland Wells, Edith Holland Wells, (Estate of) Harold Dean Wells, Frances Mangrum, Stella Wells George, Cleta Wells,

Timothy Shon Wells, Michael Shane Wells, Perry Glenn Wells, Bryan K. Westrick, John Westrick, Patricia Westrick, Whitney R. Westrick, Gerald Wilkes, Jr., Gerald Wilkes, Sr., (Estate of) Peggy Wilkes, (Estate of) Dorothy Williams, Bill Williamson, Deborah Wise, Michael Zilka, Sue Zilka, John L. Pearson, Thomas S. Perron, John Arthur Phillips, Jr., William Roy Pollard, Victor Mark Prevatt, James Price, Patrick Kerry Prindeville, Diomedes J. Quirante, Warren Richardson, Louis J. Rotondo, Michael Caleb Sauls, Charles Jeffrey Schnorf, Scott Lee Schultz, Peter Scialabba, Gary Randall Scott, Thomas Alan Shipp, Jerryl Shropshire, Larry H. Simpson, Jr., Kirk Hall Smith, Frederick Daniel Eaves, Thomas Gerard Smith, Charles Frye, Vincent Smith, Truman Dale Garner, William Scott Sommerhof, Larry Gerlach, Stephen Eugene Spencer, John Hlywiak, Horace Renardo Stephens, Jr., Orval Hunt, Craig Stockton, Joseph Jacobs, Jeffrey Stokes, Brian Kirkpatrick, Eric D. Sturghill, Burnham Matthews, Devon Sundar, Timothy Mitchell, Thomas Paul Thorstad, Lovelle Darrell Moore, Stephen Tingley, Jeffrey Nashton, Donald H. Vallone, Jr., Jolm Oliver, Eric Glenn Washington, Paul Rivers, Dwayne Wigglesworth, Stephen Russell, Rodney J. Williams, Dana Spaulding, Scipio Williams, Jr., Craig Joseph Swinson, Johnny Adam Williamson, Michael Toma, William Ellis Winter, Danny Wheeler, Donald Elberan Woollett,

Thomas D. Young, Craig Wyche, Lilla Woollett Abbey, Jeffrey D. Young, James Abbott, Marvin Albright, (Estate of) Mary Abbott, Pablo Arroyo, Elizabeth Adams, Anthony Banks, Eileen Prindeville Ahlquist, Rodney Darrell Burnette, Anne Allman, Paul Gordon, Robert Allman, Andrea Grant, (Estate of) Theodore Allman, Deborah Green, DiAnne Margaret Allman, Liberty Quirante Gregg, Margaret E. Alvarez, Alex Griffin, Kimberly F. Angus, Catherine E. Grimsley, Donnie Bates, Megan Gummer, Johnny Bates, Lyda Woollett Guz, Laura Bates, Darlene Hairston, Margie Bates, Tara Hanrahan, Monty Bates, Mary Clyde Hart, Thomas Bates, Jr., Brenda Haskill, Thomas C. Bates, Sr., Jeffrey Haskell, Mary E. Baumgartner, Kathleen S. Hedge, Anthony Baynard, Christopher Todd Helms, Bany Baynard, Marvin R. Helms, Emerson Baynard, Doris Hester, Philip Baynard, Clifton Hildreth, Henry James Parker, Julia Hildreth, Sharon Parker, Mary Ann Hildreth, Helen M. Pearson, Michael Wayne Hildreth, John L. Pearson, Jr., Frank Comes, Jr., Sonia Pearson, Glenn Dolphin, Brett Perron, Deborah Jean Perron, Michelle Perron, Ronald R. Perron, Muriel Persky, Deborah D. Peterson, Sharon Conley Petry, Sandra Petrick, Donna Vallone Phelps, Harold Phillips, John Arthur Phillips, Sr., Donna Tingley Plickys, Margaret Aileen Pollard, Stacey Yvonne Pollard, Lee Holland Prevatt, Victor Thornton Prevatt,

John Price, Joseph Price, (Estate of) Barbara D. Prindeville, Kathleen Tara Prindeville, Michael Prindeville, Paul Prindeville, Sean Prindeville, Belinda J. Quirante, Edgar Quirante, (Estate of) Godofredo Quirante, Milton Quirante, Sabrina Quirante, Susan Ray, Deborah Graves, Sharon A. Hilton, Donald Holberton, Patricia Lee Holberton, Thomas Holberton, Tangie Hollifield, Debra Horner, Elizabeth House, Joyce A. Houston, Tammy Camara Howell, Lisa H. Hudson, Lorenzo Hudson, Lucy Hudson, Ruth Hudson, William J. Hudson, Nancy Tingley Hurlburt, Cynthia Perron Hurston, Elizabeth Iacovino, Deborah Innocenzi, Kristin Innocenzi, Mark Innocenzi, Paul Innocenzi, IV, Laura M. Reininger, Alan Richardson, Beatrice Richardson, Clarence Richardson, Eric Richardson, Lynette Richardson, Vanessa Richardson, Philiece Richardson-Mills, Melrose Ricks, Belinda Quirante Riva, Barbara Rockwell, Linda Rose Rooney, Tara Smith, Tammi Ruark, Juliana Rudkowski, Marie McMahon Russell, Alicia Lynn Sanchez, Andrew Sauls, Henry Caleb Sauls, Riley A. Sauls, Margaret Medler Schnorf, Richard Schnorf (brother), Richard Schnorf (father), Robert Schnorf, Beverly Schultz, Dennis James Schultz, Dennis Ray Schultz, Frank Scialabba, Jacqueline Scialabba, Samuel Scott Scialabba, Jon Christopher Scott, Kevin James Scott, (Estate of) Larry L. Scott, Mary Ann Scott, Sheria Scott,

Stephen Allen Scott, Jacklyn Seguerra, Bryan Richard Shipp, James David Shipp, Janice Shipp, Maurice Shipp, Pauline Shipp, Raymond Dennis Shipp, Russell Shipp, Susan J. Sinsioco, Ana Smith-Ward, Thomasine Baynard, Timothy Baynard, Wayne Baynard, Stephen Baynard, Anna Beard, Mary Ann Beck, Alue Belmer, Annette Belmer, Clarence Belmer, Colby Keith Belmer, Denise Belmer, Donna Belmer, Faye Belmer, Kenneth Belmer, Luddie Belmer, Shawn Biellow, Mary Frances Black, Donald Blankenship, Jr., Donald Blankenship, Sr., (Estate of) Mary Blankenship, Alice Blocker, Douglas Blocker, John R. Blocker, Robert Blocker, James Boccia, Joseph Boccia, Sr., Patricia Boccia, Raymond Boccia, Richard Boccia, Ronnie Veronica Boccia, Leticia Boddie, Angela Bohannon, Anthony Bohannon, Carrie Bohannon, David Bohannon, Edna Bohannon, Leon Bohannon, Sr., Ricki Bohannon, Billie Jean Bolinger, Joseph Boulos, Lydia Boulos, Marie Boulos, Rebecca Bowler, Lavon Boyett, (Estate of) Norman E. Boyett, Jr., Theresa U. Roth Boyett, William A. Boyett, Susan Schnorf Breeden, Damian Briscoe, Christine Brown, Rosanne Brunette, Mary Lynn Buckner, (Estate of) Claude Burley, (Estate of) William Douglas Burley, Myra Burley, Kathleen Calabro, Rachel Caldera, Avenell Callahan, Michael Callahan, Patrica Patsy Ann Calloway, Elisa Rock Camara, Theresa Riggs Camara, Candace Campbell, Clare

Campus, Elaine Capobianco, Florene Martin Carter, Phyllis A. Cash, Theresa

Catano, Bruce Ceasar, Franklin Ceasar, Fredrick Ceasar, Robbie Nell Ceasar,

Sybil Ceasar, Christine Devlin Cecca, Tammy Chapman, James Cherry, Sonia

Cherry, Adele H. Chios, Jana M. Christian, Sharon Rose Christian, Susan

Ciupaska, Leshune Stokes Clark, Rosemary Clark, Mary Ann Cobble, Karen

Shipp Collard, Jennifer Collier, Melia Winter Collier, Deborah M. Coltrane,

Roberta Li Conley, Charles F. Cook, Elizabeth A. Cook, Bernadette Jaccom, John

Jackowski, Jr., John Jackowski, Sr., Victoria Jacobus, Elaine James, Nathalie C.

Jenkins, Stephen Jenkins, Rebecca Jewett, Linda Martin Johnson, Ray Johnson,

Rennitta Stokes Johnson, Sherry Johnson, Charles Johnston, Edwin Johnston,

Mary Ann Johnston, Zandra LaRiviere Johnston, Alicia Jones, Corene Martin

Jones, Kia Briscoe Jones, Mark Jones, Ollie Jones, Sandra D. Jones, (Estate of)

Synovure Jones, Robin Copeland Jordan, Susan Scott Jordan, Joyce Julian, Karl

Julian, Nada Jurist, Adam Keown, Bobby Keown, Jr., Bobby Keown, Sr., Darren

Keown, William Keown, Mary Joe Kirker, Kelly Kluck, Michael Kluck, (Estate of)

John D. Knipple, John R. Knipple, (Estate of) Pauline Knipple, Shirley L. Knox,

Doreen Kreischer, Freas H. Kreischer, Jr., Cynthia D. Lake, Wendy L. Lange,

James Langon, III, Eugene LaRiviere, Joyce Woodle, Beverly Woollett, Paul

Woollett, Melvina Stokes Wright, Patricia Wright, Glenn Wyche, John Wyche,

John F. Young, John W. Young, Judith Carol Young, Sandra Rhodes Young,

Joanne Zimmerman, Stephen Thomas Zone, Patricia Thorstad Zosso, Jarnaal

Muata Ali, Margaret Angeloni, Jesus Arroyo, Milagros Arroyo, Olympia

Carletta, Kimberly Carpenter, Joan Comes, Patrick Comes, Christopher Comes,

Frank Comes, Sr., Deborah Crawford, Barbara Davis, Alice Warren Franklin,

Patricia Gerlach, Travis Gerlach, Megan Gerlach, Arminda Hernandez, Margaret

Hlywiak, Peter Hlywiak, Jr., Peter Hlywiak, Sr., Paul Hlywiak, Joseph Hlywiak,

Cynthia Lou Hunt, Rosa Ibarro, Andrew Scott Jacobs, Daniel Joseph Jacobs,

Danita Jacobs, Kathleen Kirkpatrick, Grace Lewis, Lisa Magnotti, Wendy

Mitchell, (Estate of) James Otis Moore, (Estate of) Johnney S. Moore, Marvin S.

Moore, Alie Mae Moore, Jonnie Mae Moore-Jones, (Estate of) Alex W. Nashton,

Paul Oliver, Riley Oliver, Michael John Oliver, Ashley E. Oliver, Patrick S.

Oliver, Kayley Oliver, Tanya Russell, Wanda Russell, Jason Russell, Clydia

Shaver, Mary Stilpen, Kelly Swank, (Estate of) Kenneth J. Swinson, (Estate of)

Ingrid M. Swinson, Daniel Swinson, William Swinson, Dawn Swinson, Teresa

Swinson, Bronzell Warren, Jessica Watson, Audrey Webb, Jonathan Wheeler,

Benjamin Wheeler, (Estate of) Marlis Molly Wheeler, Kerry Wheeler, Andrew

Wheeler, Brenda June Wheeler, Jill Wold, (Estate of) Nora Young, James Young, (Estate of) Robert Young, Scott Spaulding, Cecilia Stanley, Miralda, (Judith Maitla Alarcon), (Estate of) Samuel Hudson, (Estate of) Susan Thorstad Hudson, (Estate of) Edward Iacovino, Sr.